INTERNATIONAL LONGSHOREMEN'S AND WAREHOUSEMEN'S UNION, et al., Petitioners,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent,

Sea–Land Service, Inc., Intervenor.

No. 88–1647.

United States Court of Appeals, District of Columbia Circuit.

Argued April 4, 1989.

Decided Sept. 5, 1989.

William H. Carder, San Francisco, Cal., for petitioners.

Richard A. Cohen, Atty., N.L.R.B., with whom Howard E. Perlstein, Supervising Atty., N.L.R.B., and Aileen A. Armstrong, Deputy Associate General Counsel, Wash-

ington, D.C., N.L.R.B., were on the brief, for respondent.

Robert J. Attaway, with whom Anthony J. Gaspich, New York City, John W. McConnell, and Robert S. Zuckerman, Edison, N.J., were on the brief, for intervenor.

Before MIKVA, SILBERMAN, and D.H. GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

This case is one more in the long series of efforts by the National Labor Relations Board ("NLRB") to deal with disputes between the Longshoremen (ILWU on the West Coast and ILA on the East) and Teamsters, which arise out of the handling of shipping containers.[1] Here, petitioners, ILWU Locals 13 and 63, seek review of a Board order determining that the ILWU violated section 8(b)(4)(D) of the National Labor Relations Act by filing collective bargaining grievances against Sea–Land Service, Inc. because it assigned work to employees represented by Local 692 of the Teamsters rather than to petitioners' members. The Board determined that the grievances were inconsistent with its prior section 10(k) award of the disputed work to the Teamster-represented employees. We deny the petition and grant the Board's cross-application for enforcement of its order.

## I.

Prior to 1980, Sea–Land Service, Inc. maintained two sites in Long Beach, California for handling containers, a thirty-seven-acre fenced marine container yard on the waterfront and a fifteen-acre container freight station located about two miles inland. The containers are stuffed and unstuffed at the freight station and loaded (and unloaded) onto (and from) ships at the container yard. The Container Stevedoring Corporation, whose employees are represented by the International Longshoremen and Warehousemen's Union ("ILWU"), is under contract with Sea–Land to supply marine yard workers. Local 63 of the ILWU represents the equipment operators, and Local 13 the clerical workers. The General Truck Drivers, Chauffeurs & Helpers Union, Local 692, International Brotherhood of Teamsters represents Sea–Land's freight station employees.

Because of overcrowding at the yard, in 1980, Sea–Land leased Pelican Pond, an unfenced area directly across a public street from the container yard, to store or "stage" containers. When containers are staged they are either "grounded"—placed directly on the ground—or stacked one on top of the other, two or three high. Containers, when transferred, are placed on a chassis—a metal framework with wheels—and then hauled by a tractor driver. While not in use, the chassis are stacked or "bundled" four or five high so that they can be moved by a single driver. Stacking and unstacking of containers is accomplished with the use of large forklifts. When a container must be moved from one chassis to another—a process called "flipping"—either two forklifts are used, or a top-handling machine, which is a sort of crane that grips the four corners of the container and lifts it onto a new chassis, is employed.

After leasing Pelican Pond, Sea–Land assigned work there to its Teamster-represented freight station employees. This gave rise to the dispute between the Teamsters, the ILWU, and Sea–Land which ultimately led to this court. Both unions claimed the work at Pelican Pond, asserting that the operations there were merely an extension of the work each had traditionally performed. In fact, both groups of

1. See, e.g., NLRB v. International Longshoremen's Ass'n, 473 U.S. 61, 105 S.Ct. 3045, 87 L.Ed.2d 47 (1985); NLRB v. International Longshoremen's Ass'n, 447 U.S. 490, 100 S.Ct. 2305, 65 L.Ed.2d 289 (1980); California Cartage Co. v. NLRB, 822 F.2d 1203 (D.C.Cir.1987); Lewis v. New Orleans Clerks & Checkers, I.L.A. Local No. 1497, 724 F.2d 1109 (5th Cir.1984); Pascarell v. New York Shipping Ass'n, 650 F.2d 19 (3d Cir.) cert. denied, 454 U.S. 832, 102 S.Ct. 130, 70 L.Ed.2d 110 (1981); Consolidated Express Inc. v. New York Shipping Ass'n, Inc., 641 F.2d 90 (3d Cir.1981); International Longshoremen's Ass'n, Local 1575 v. NLRB, 560 F.2d 439 (1st Cir.1977); Intercontinental Container Transp. Corp. v. New York Shipping Ass'n, 426 F.2d 884 (2d Cir.1970).

employees had grounded, staged and flipped containers, and bundled chassis, but they had done so at two different locations. The Teamsters had done this work at the freight station and storage areas, away from the waterfront, while the ILWU performed these tasks within the yard and, occasionally, along the waterfront or at another company's container yard adjacent to Sea–Land's.

Asserting entitlement to the work, the ILWU filed a grievance under its collective bargaining agreement with the Pacific Maritime Association ("PMA"), to which Sea–Land and ILWU are signatories. In its grievance, the ILWU claimed it was due "time-in-lieu payments" [2] for the work performed by the Teamsters on March 29 and April 1, 1980 at Pelican Pond. The area arbitrator, George Love, found Sea–Land in violation of the agreement and ordered Sea–Land to make the payments, and the coast arbitrator, Sam Kagel, upheld the award. (December 17, 1980). Shortly thereafter, the Teamsters threatened to picket Sea–Land if it assigned work at Peli-

can Pond to the ILWU. Sea–Land responded by charging that the Teamsters had violated section 8(b)(4)(D) of the National Labor Relations Act, 29 U.S.C. § 158(b)(4)(ii)(D) (1982).[3]

Upon the filing of a section 8(b)(4)(D) unfair labor practice charge, section 10(k) [4] of the Act authorizes the Board to conduct a hearing and resolve the underlying dispute between the two contesting employee groups. *See* 29 U.S.C. § 160(k) (1982).[5] Following a section 10(k) hearing, the Board awarded the work in dispute to the Teamsters. Its decision rested chiefly on the relative economy and efficiency of the Teamsters performing the work, and on Sea–Land's preference for the Teamsters. The Board seemed to rely particularly on the fact that "[t]he record ... clearly discloses that assigning the work to longshoremen rather than to teamsters would require the Employer to utilize a greater number of employees." *General Truck Drivers, Chauffeurs & Helpers Union, Local 692 (Sea–Land Service, Inc.)*, 258 N.L.

**2.** A claim for "time-in-lieu" payments is made when one employee group asserts a right to payment for work which it believes it was entitled to perform, although it did not have an opportunity to do so, because it was not assigned the work.

**3.** Section 8(b)(4)(ii)(D) reads:
(b) It shall be an unfair labor practice for a labor organization or its agents—
(4) ... (ii) to *threaten, coerce, or restrain any person* engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—
(D) forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another trade, craft or class, unless such employer is failing to conform to an order or certification of the Board determining the bargaining representative for employees performing such work.
29 U.S.C. § 158(b)(4)(ii)(D) (1982) (emphasis added).

**4.** Section 10(k) reads:
Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4)(D) of section 158(b) of this title, the Board is empowered and directed to hear and determine the dispute out of which such unfair labor practice shall have arisen, unless, within ten days after no-

tice that such charge has been filed, the parties to such dispute submit to the Board satisfactory evidence that they had adjusted, or agreed upon methods for the voluntary adjustment of, the dispute. Upon compliance by the parties to the dispute with the decision of the Board or upon such voluntary adjustment of the dispute, such charge shall be dismissed.
29 U.S.C. § 160(k) (1982).

**5.** Once a charge is made,
[i]f it appears to the regional director that the charge has merit and the parties to the dispute have not submitted satisfactory evidence to the regional director that they have adjusted, or have agreed upon methods for the voluntary adjustment of, the dispute out of which such unfair labor practices shall have arisen, he shall cause to be served on all parties to such dispute a notice of hearing under section 10(k)....
20 C.F.R. § 102.90. If the regional director decides to issue the complaint, then a hearing is conducted by an Administrative Law Judge, who passes a transcript of the hearing, along with recommendations, to the Board, which determines which group of employees is entitled to perform the disputed work. Section 10(k) requires that the Board resolve all jurisdictional disputes in favor of one or the other parties. *See NLRB v. Radio and Television Broadcast Eng'r Union, Local 1212*, 364 U.S. 573, 586, 81 S.Ct. 330, 338, 5 L.Ed.2d 302 (1961) [*"CBS"*].

R.B. No. 55 at 11, 12 (Sept. 30, 1981). The ILWU unsuccessfully moved for reconsideration of the Board's decision but did not at that time otherwise seek to challenge the Board's determination by conduct which might prompt Sea–Land to file an unfair labor practice charge against it. *See, e.g., Longshoremen, ILWU Local 62–B v. NLRB*, 781 F.2d 919, 923 (D.C.Cir. 1986) (*"Alaska"*), *Bricklayers' Union v. NLRB*, 475 F.2d 1316 (D.C.Cir.1973).

After the section 10(k) order issued in September of 1981, and until the end of 1982, Sea–Land used the Teamsters to stack, stage, and flip containers and to bundle chassis at Pelican Pond. On January 10, 1983 the ILWU again filed grievances claiming that Sea–Land was violating its collective bargaining agreement with PMA by assigning Pelican Pond work to the Teamster-represented employees. Notwithstanding the Board's section 10(k) order, the area arbitrator again determined that Sea–Land was in violation of the contract. Sea–Land paid the longshoremen $4,300 under protest but continued to assign the disputed work to the Teamsters. On January 24, Richard Lomelli, a Local 13 business agent, told a Sea–Land representative that he would "walk the gang" if Teamsters continued to perform work at Pelican Pond. Sea–Land responded with a two-pronged attack: on January 26, 1983, it filed suit in Federal District Court seeking to vacate the arbitration awards upon which the ILWU claims rest, to enjoin the Longshoremen from filing grievances claiming time-in-lieu payments and from threatening work stoppages in connection with Pelican Pond. Two days later, Sea–Land filed a new section 8(b)(4)(D) charge, this time against the ILWU. The district court stayed the lawsuit pending resolution of the NLRB proceedings.

Sea–Land's charge alleged that the Longshoremen's union, through the filing of grievances which were contrary to the section 10(k) award, committed an unfair labor practice in violation of section 8(b)(4)(D). Sea–Land further claimed that Lomelli's vow to "walk the gang" was a "threat" of work stoppage which also violated that section. The NLRB issued a complaint and a hearing was held pursuant to section 10(c) of the Act. *See* 29 U.S.C. § 160(c) (1982). In its defense, the ILWU asserted that it had not violated the section 10(k) award as it was seeking payment for work that was not covered by the award. Specifically, the Longshoremen's union claimed that the tasks performed in January 1983, for which it sought payment, involved flipping and bundling, which were not mentioned in the Board's description of the disputed work set forth in the section 10(k) award. There the Board had defined the work as "the transportation and grounding of containers outside the container yard, and the work incident thereto, as well as the return of such containers to the container yard, and the work incident thereto ... [and] also ... the temporary staging of containers outside the container yard, and the work incident thereto, and the return of such containers to the container yard, and the work incident thereto." 258 N.L.R.B. No. 55 at 5. The ILWU's contention was flatly rejected: "it is crystal clear that the flipping, bundling and unbundling of chassis at Pelican Pond is work incident to the transportation of containers." *International Longshoremen's and Warehousemen's Union, Locals 13 and 63 (Sea–Land Service, Inc.),* 290 N.L.R.B. No. 76 (July 29, 1988) ALJ Decision at 5.

The Longshoremen also argued, unsuccessfully, that the filing of the grievances could not amount to an unfair labor practice as they were sanctioned as reasonably-based and properly-motivated litigation under *Bill Johnson's Restaurants v. NLRB*, 461 U.S. 731, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983). The Board held that the filing of the grievances was a section 8(b)(4)(D) violation because "the grievances sought payments for work that was explicitly included in the Board's prior Section 10(k) award to Teamsters-represented employees or, as the judge found, 'clear[ly]' incident to that work. The [ILWU] therefore unlawfully sought to undermine the Board's award." 290 N.L.R.B. No. 76 at 3 (footnote omitted).

The Longshoremen then petitioned for review and the Board filed a cross applica-

tion seeking enforcement of its decision and order. See 29 U.S.C. §§ 160(f), (e) (1982).

## II.

The ILWU's petition raises several challenges to the Board order. First, the union argues that both the 1980 and 1983 disputes were not "jurisdictional" and thus outside the reach of section 8(b)(4)(D). That is so, according to petitioners because Sea–Land was not neutral in the dispute (the dispute "was of its own making"), and because the ILWU was motivated by work preservation. The union further argues that even assuming both disputes were jurisdictional, the second one, concerning flipping and bundling, was not determined in the first section 10(k) proceeding and therefore the Board was obliged to order a new section 10(k) hearing focused on those additional tasks. The union also contends that it never engaged in "coercion" within the meaning of section 8(b)(4)(D) because the filing of grievances asserting a violation of its collective bargaining agreement with Sea–Land did not constitute coercion. Finally, it claims that the Local 13 business agent's threat of a work stoppage was "*de minimis.*"

We think two of these claims merit full discussion: whether the disputes were jurisdictional and whether the grievances themselves constitute coercion. The other two arguments present little challenge to the Board's order and we, of course, must defer to the Board's reasonable interpretation of its own 1980 award. *See National Motor Freight Traffic Ass'n v. ICC*, 590 F.2d 1180, 1184 (D.C.Cir.1978). Although "flipping and bundling" were not explicitly mentioned in the Board's description of the work in dispute, the Board had substantial evidence before it to establish that flipping and bundling (or unbundling) were "incidental" to the transportation and grounding of containers. Sea–Land's operations, by necessity, implicate flipping and bundling in the transportation and grounding of containers. *See* 290 N.L.R.B. No. 76 at 3; ALJ Dec. at 5. As for petitioners' argument that the Local 13 business agent's

threat was "*de minimis,*" there is simply no significant support for that proposition.

## III.

■ As we recently explained in *Alaska*, the paradigm jurisdictional dispute addressed by section 8(b)(4)(D) is a contest between two *groups* of employees that actively contend for disputed work, where the assigning employer is indifferent to the claims of the rival unions. *See Alaska*, 781 F.2d at 921. The employer is thus caught "between the devil and the deep blue." *CBS*, 364 U.S. at 575, 81 S.Ct. at 332. There can be no question here that the ILWU and the Teamsters are both actively, indeed insistently, claiming the Pelican Pond container-handling work. They have used every technique imaginable to pressure Sea–Land to assign to them the disputed work. Nevertheless, petitioners assert that Sea–Land is responsible for creating the dispute and is not "indifferent" to its resolution because it originally assigned the work to the Teamsters.

To be sure, Sea–Land's leasing of Pelican Pond to relieve overcrowding in the yard is the *casus belli* of the dispute. But, in light of the overcrowded condition in the yard, it would appear that Sea–Land was obliged to lease additional space. This seems to us to be quite a different situation from that presented in *Alaska*, in which we held no jurisdictional dispute existed. There the employer had fundamentally changed its business practice from using its employees to deliver lumber only to the dock, where longshoremen took over and loaded the lumber onto the ships, to a new regime, whereby it used its employees to transport the lumber to the dock *and* to load the lumber onto ships, totally eliminating the longshoremen's work. The *Alaska* employer's shift in business practice seems to have been designed totally to supplant the Longshoremen with its own employees. Thus, that dispute could properly be described as one created by the employer. By contrast, there is no contention here that Sea–Land's lease of Pelican Pond was for the very purpose of transferring work

from Longshoremen to Teamsters.[6] Once one accepts the uncontested proposition that Sea–Land was induced to lease Pelican Pond because its yard was overcrowded and that overcrowding caused inefficiencies, it seems impossible to say the dispute was, as we said in *Alaska*, "*entirely* of the employer's making." 781 F.2d at 925 (emphasis added).

Typically a dispute between rival groups of employees for the same work will be engendered by some change in the business environment that creates new working conditions. But, if every action taken, no matter how natural or inevitable a business step, which gives rise to a dispute between rival groups of employees, disqualified an employer from section 8(b)(4)(D) relief, that section would become a dead letter. Certainly when, as here, the employer expands his operational territory for business reasons that apply regardless of which group of employees is assigned the work at the new location, the dispute between the two groups is independent of the employer's action and is therefore "jurisdictional." Nor do we think it determinative that Sea–Land assigned the Pelican Pond work to its own employees, who are represented by the Teamsters, rather than to the Longshoremen, who are employees of the Container Stevedoring Company, Inc. Once it

expanded its operational territory, it, perforce, would have had to give the work at the new location to one or the other.[7] Whatever the choice, it would appear that Sea–Land would have been faced with a protest from the aggrieved union.

The ILWU argues that, in any event, its purpose in seeking jurisdiction over Pelican Pond was clearly "work preservation" and, if established, that motivation is a defense to a section 8(b)(4)(D) complaint just as it would be to a section 8(b)(4)(B) complaint. As we noted in *Alaska*, however, "the theoretical bases for each charge are different." 781 F.2d at 922. If a union can show that its conduct, which would otherwise be proscribed by section 8(b)(4)(B) [8] as a secondary boycott, is designed to preserve to it work that it has previously performed, then it has made out a defense to the charge or complaint because the dispute is, in that event, deemed primary rather than secondary. *See, e.g., NLRB v. International Longshoremen's and Warehousemen's Ass'n,* 447 U.S. 490, 100 S.Ct. 2305, 65 L.Ed.2d 289 (1980). Section 8(b)(4)(D), on the other hand, assumes a primary dispute between two separate groups of employees and an employer.[9] Of course, the basic dispute is one between the two employee groups, which is why it is

---

6. The ILWU hints, but never argues, that the reason the yard was overcrowded was because Sea–Land leased part of it to other shipping companies.

7. In *Alaska* we noted the employer had a strong interest in assigning ship-loading work to its own employees rather than longshoremen, but that was in the context, as we have explained, of an employer's decision to change its method of operations abruptly so as to totally displace the longshoremen. That the employer may prefer one group of employees over another, however, does not render a dispute non-jurisdictional. Indeed, in deciding Section 10(k) proceedings, the Board gives weight to employer preference. *See, e.g., Typographical Union, Local 2 (Philadelphia Inquirer),* 142 N.L.R.B. 36 (1963); *Machinists Local 1743 (J.A. Jones Constr. Co.),* 135 N.L.R.B. 1402 (1962).

8. Section 8(b)(4)(ii)(B) makes it "an unfair labor practice for a labor organization or its agents—
　(4) ... (ii) to threaten, coerce, or restrain any persons engaged in commerce or in an indus-

try affecting commerce, where in either case an object thereof is—
　(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title: *Provided,* That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any *primary* strike or *primary* picketing."
29 U.S.C. § 158(b)(4)(ii)(B) (1982) (emphasis added).

9. The longshoremen are actually employed by Container Stevedoring, but no party gives that fact any significance in the case; Container Stevedoring is treated as if it were an extension of Sea–Land. *But see Alaska* at 925.

called "jurisdictional," but typically both groups, in asserting their claim against the employer, are also pursuing a primary dispute with the employer. Indeed, it is precisely because in a section 8(b)(4)(D) situation both disputes with the employer are, in a sense, primary, that the Act provides a mechanism (section 10(k)) whereby the Board can resolve the dispute itself rather than merely proscribe coercion and let the dispute continue as it must do in a section 8(b)(4)(B) case.[10]

The Board has, it must be admitted, occasionally described a dispute, driven by a union's desire to preserve its work, as other than a jurisdictional dispute but, in such cases, as we understand them, the real difficulty was either that there was *only* a work preservation dispute between employees and their employer—*i.e.*, there was no second group of employees actively in conflict with the first, *see, e.g., International Bhd. of Elec. Workers, Local 292 (Franklin Broadcasting Co.),* 126 N.L.R.B. 1212, 1215 (1960) (reallocation of work between two categories of employees, both of the same union)—or the dispute was, as in *Alaska,* of the employer's own making, *see, e.g., Seattle Bldg. & Constr. Trades Council,* 204 N.L.R.B. 1126, 1127 (1973) (employer replaced employees of one union with members of rival union); *Chauffeurs, Teamsters and Helpers, Local 331 (Bulletin Company),* 139 N.L.R.B. 1391, 1395–96 (1962) (same); *Highway Truckdrivers & Helpers, Local 107 (Safeway Stores, Inc.),* 134 N.L.R.B. 1320, 1322–23 (1961) (same).

## IV.

■ Petitioners contend that the filing of a grievance, under its collective bargaining agreement, to challenge Sea–Land's assignment of work to its Teamster-represented employees—notwithstanding the Board's section 10(k) award—is not "coercion" under section 8(b)(4)(D). This implicitly raises the issue of which source of law takes precedence: the Board's authority under section 10(k) or the ILWU's rights under its contract? We think the section 10(k) award trumps the collective bargaining agreement. The Supreme Court long ago, in *Carey v. Westinghouse Elec. Corp.,* 375 U.S. 261 (1964), held that a union could file a grievance and compel arbitration of a dispute with a contracting employer even if the dispute was jurisdictional. If the dispute continued after arbitration and caused a section 8(b)(4)(D) charge (no such charge was brought in *Westinghouse*), the Board could give the arbitrator's award that weight it thought appropriate. However, "[s]hould the Board disagree with the arbiter ... the Board's ruling would, of course, take precedence.... The superior authority of the Board may be invoked *at any time." Id.* at 272 (emphasis added).

In this case, petitioners sought and gained arbitration of their claims both before the Board's section 10(k) proceeding—though the Board disregarded the results of that arbitration—and afterwards as, in effect, a collateral attack on the Board's award. It is the latter step, which the Board regards as "coercion" under section 8(b)(4)(ii)(D). *See Local 7, International Longshoremen's and Warehousemen's Union (Bellingham Division, Georgia Pacific Corp.),* 291 N.L.R.B. No. 13 (Sept. 30, 1988).[11] Petitioners recognize that the word coercion is "nonspecific, indeed vague" *NLRB v. Drivers, Chauffeurs, Helpers Local Union Local No. 693,* 362

---

10. Work preservation may or may not be a factor considered by the Board when determining the merits of a section 10(k) proceeding. Petitioners in this case did not challenge the merits of the section 10(k) award.

11. In that case, the Board was faced with a situation where time-in-lieu grievances had been filed both before and after the Board's section 10(k) decision was handed down. It held that those grievances filed *before* the section 10(k) award were not "coercive" within the meaning of the Act, whereas those that were filed *after*

the section 10(k) award issued did violate the Act, as "at that point the grievance filings lacked a reasonable basis and reflected an improper motivation to undermine the Board's 10(k) award." The Board did not find "coercive" the grievance filed *before* the section 10(k) award issued because of the strong policy preference for the "grievance-arbitration" method of dispute resolution. *International Longshoremen's and Warehousemen's Union, Local 7 (Bellingham Division, Georgia–Pacific Corp.),* 291 NLRB No. 13 at 10 (1988) (slip op.).

U.S. 274, 290 (1960), and we, therefore, must defer to the Board's interpretation if reasonable. *See NLRB v. United Food & Commercial Workers Union, Local 23*, 108 S.Ct. 413, 421 (1987). We think the Board's interpretation is indeed reasonable; it may even be inevitable. For if petitioners were entitled to assert contract claims against Sea–Land, in contravention of the Board's section 10(k) award, the very purpose of section 10(k)—to authorize the Board to resolve the jurisdictional dispute—would be totally frustrated. We thus agree with the Ninth Circuit opinion in *International Longshoremen's and Warehousemen's Union Local 32 v. Pacific Maritime Ass'n*, 773 F.2d 1012 (9th Cir. 1985), *cert. denied*, 476 U.S. 1158 (1986) ("*Weyerhaeuser*"), involving quite similar facts. *Weyerhaeuser* distinguished other circuit court cases holding that under section 8(b)(4)(B) a union bringing a lawsuit to enforce contractual rights does not engage in "coercion" on grounds that those cases did not present an irreconcilable conflict between a Board order and contractual remedies. *See id.* at 1018–19. As we have previously noted, *see supra* at 11–13, section 8(b)(4)(B) only proscribes the use of certain tactics against secondary employers, whether or not those tactics are in furtherance of a primary dispute, whereas section 8(b)(4)(D) and section 10(k), unlike section 8(b)(4)(B), together provide for the resolution of the basic dispute and that resolution is directly threatened by petitioners' recourse to contract enforcement machinery.

Nor do we believe that the union's motivation or the reasonableness of its basis for its breach of contract claim is at all relevant in this case. It is not clear to us, in that regard, that *Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731 (1983), is applicable to the question before us. In *Bill Johnson's* the Court was faced with the quite different kind of question wheth-er an employer's *state* libel action against picketing employees may be treated by the NLRB as "interference" with protected activity under sections 8(a)(1) and (4) of the Act, 29 U.S.C. §§ 158(a)(1), (4) (1982). That presented a delicate issue of the legitimacy of the Board's prohibition of a party's recourse to state legal remedies not generically preempted. "It should be kept in mind that what is involved here is an employer's lawsuit that the federal law would not bar except for its allegedly retaliatory motivation." *Bill Johnson's*, 461 U.S. at 737 n. 5. The Court held that such a suit violated the Act *only* if it was brought with an improper motive *and* without a reasonable basis. *See id.* at 744. But it distinguished a suit "that has an objective that is illegal under federal law," *id.* at 737 n. 5, because in that case the plaintiff's motivation and the reasonable basis of the action presumably is irrelevant.

The case before us raises the question whether petitioner's grievance has just that illegal objective as a matter of federal law.[12] We think the Board reasonably concluded that it does, because, whatever the union's motivation and no matter how persuasive its contractual case, a union cannot force an employer to choose between a Board section 10(k) award and a squarely contrary contract claim. *See International Union of Operating Eng'rs, Local No. 714 v. Sullivan Transfer, Inc.*, 650 F.2d 669, 678 n. 28 (5th Cir.1981). That, like the jurisdictional dispute itself, would place the employer between "the devil and the deep blue." *Compare Associated Gen. Contractors Inc. v. IUOE Local 701*, 529 F.2d 1395 (9th Cir.1976) (holding that a prior section 10(k) award will not preclude the filing of a grievance where the employer could comply with both the award and the collective bargaining agreement). Under these circumstances, as the Supreme Court indicated in *Westinghouse, see* 375 U.S. at 272, the Board order must prevail.

---

12. In *Weyerhaeuser,* the Ninth Circuit reasoned that the union *necessarily* had an improper motive—circumventing the Board's award—and that the union *necessarily* lacked a reasonable basis because, under *Westinghouse, see* 375 U.S. at 272, the Board's section 10(k) ruling takes precedence over contrary arbitration awards. That is merely another way of saying the *Bill Johnson's* test is not really relevant to a situation where there is a direct conflict between a Board order and a contract claim.

We therefore deny the petition and grant the cross motion to enforce the Board's order.

*It is so ordered.*