## GEORGIA–PACIFIC CORPORATION, Petitioner,

v.

## NATIONAL LABOR RELATIONS BOARD, Respondent,

### Local Union No. 7, International Longshoremen's and Warehousemen's Union, Intervenor.

#### No. 88–1751.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 8, 1989.

Decided Dec. 29, 1989.

Bruce M. Cross, Seattle, Wash., for petitioner.

David A. Fleischer, Atty., N.L.R.B., with whom Robert E. Allen, Associate Gen. Counsel, Aileen A. Armstrong, Deputy Associate Gen. Counsel and Howard E. Perlstein, Atty., N.L.R.B., Washington, D.C., were on the brief for respondent.

Richard S. Zuckerman, Washington, D.C., for intervenor.

Before WALD, Chief Judge, and EDWARDS and D.H. GINSBURG, Circuit Judges.

Opinion for the Court filed Per Curiam.

PER CURIAM:

This appeal is from the National Labor Relations Board's ("NLRB" or "Board") ruling that it was not "coerc[ive]," within the meaning of § 8(b)(4)(D) of the National Labor Relations Act ("Act"), for a union to file, pursuant to a collective bargaining agreement, grievances against an employer for money payments in lieu of work performed by members of another union which the grievant claimed should have been assigned to it under the contract, so long as the Board had not awarded that work to the other union in a proceeding under § 10(k) of the Act. We hold that the Board's ruling was a reasonable interpretation of the Act in light of the facts, and accordingly deny the petition for review.

## I. FACTS

The facts are essentially undisputed. The Georgia–Pacific Corporation ("Georgia–Pacific"), petitioner, manufactures chemicals at its plant in Bellingham, Washington. In its manufacture of chlorine, the company uses large quantities of salt. Salt arrives by ship or barge at a dock owned by the Port of Bellingham. Workers unload the salt from the ship or barge, and place it in a hopper. Conveyor belts then bring the salt to an inland "salt pad" near the manufacturing facility. Prior to 1981, a moving "shuttle conveyor" ensured that the salt spread out evenly across the salt pad and did not pile up during the unloading process. Starting in September of 1981, however, Georgia–Pacific discontinued use of the shuttle conveyer. Instead, workers using bulldozers now keep the salt spread evenly about the salt pad during the unloading process.

The workers who drive the bulldozers are employed by Georgia–Pacific and are represented by the Association of Western Pulp and Paper Workers ("AWPPW"). The dock workers who first unload the salt are employed by the Bellingham Stevedoring Company ("Bellingham"), and are represented by the International Longshoremen's & Warehousemen's Union ("ILWU"). Bellingham is a member of the Pacific Maritime Association ("PMA"), a multi-employer group that bargains with the ILWU. The collective bargaining agreement between the PMA and the ILWU is known as the Pacific Coast Longshore Contract Document ("PCLCD").

When bulldozers were first used to spread salt during the unloading process,

the ILWU claimed the right under the PCLCD to drive the bulldozers. It filed a grievance, claiming that Bellingham was liable to it for "time-in-lieu payments": money payments in lieu of the work that Bellingham had allegedly promised to obtain for union members. The AWPPW threatened to strike if the work was assigned to the ILWU. Georgia–Pacific claimed that the unions had violated § 8(b)(4)(D) of the National Labor Relations Act, which prohibits "coerc[ing]" any person engaged in commerce, where an object thereof is "forcing or requiring any employer to assign particular work to employees in a particular labor organization ... rather than to employees in another labor organization ... unless such employer is failing to conform to an order or certification of the Board." 29 U.S.C. § 158(b)(4)(D).

Pursuant to § 10(k) of the Act, 29 U.S.C. § 160(k), the Board held a proceeding to resolve the underlying jurisdictional dispute between the two unions. While that proceeding was pending, an arbitrator ruled in favor of the ILWU on its grievance. The Board subsequently awarded the disputed work to the AWPPW.

Following the Board's § 10(k) decision, the ILWU continued to submit grievances claiming payment in lieu of the work. The Board later found that the ILWU had violated § 8(b)(4)(D) by failing to comply with the § 10(k) award, but also found that the grievances filed prior to the issuance of the award did not violate the Act. Both the ILWU and Georgia–Pacific appealed to this court, but as the union subsequently dismissed its appeal all that remains is Georgia–Pacific's challenge to the Board's ruling on the grievances filed prior to the issuance of the § 10(k) award.

## II. ANALYSIS

▮ National labor policy favors the private settlement of jurisdictional disputes between two unions. *Carey v. Westinghouse Corp.*, 375 U.S. 261, 264–66, 84 S.Ct. 401, 405–06, 11 L.Ed.2d 320 (1964). In *Carey*, the Supreme Court emphasized that grievance arbitration plays an important role in the private settlement process. Indeed, the Court specifically concluded that "§ 10(k) not only tolerates but actively encourages voluntary settlements of work assignment controversies between unions," *id.* at 266, 84 S.Ct. at 406, and that "grievance procedures pursued to arbitration further the policies of the Act," *id.* We held in *ILWU v. NLRB (Sea–Land)*, 884 F.2d 1407 (D.C.Cir.1989), that the concept of coercion "is nonspecific, indeed vague," *id.* at 1413 (internal quotation omitted), and that we must therefore defer to the Board's interpretation if it is reasonable. *Carey's* specific approval of grievance arbitration as a means of settling jurisdictional controversies strongly supports the Board's finding that as a general rule the filing of grievances is not coercive for the purposes of § 8(b)(4)(D).

Georgia–Pacific's claim that the ILWU's filing of a time-in-lieu grievance was nonetheless illegally coercive is based on two arguments, each of which we reject. First, Georgia–Pacific claims that the filing of a grievance cannot further the policy of private dispute resolution where, as here, the employer against whom the grievance is filed does not have control of the disputed work. However, as the Board found, the grievance process can still play a valuable role. In particular, the grieving union might lose the grievance, and the dispute would likely then end without Board intervention. Even if the union wins, "the therapy of arbitration is brought to bear in a complicated and troubled area." *Carey*, 375 U.S. at 272, 84 S.Ct. at 409.

Georgia–Pacific also sees an inconsistency between the Board's finding that grievances are not coercive in the context presented by this case and its finding in other cases that a grievance can be illegally coercive under § 8(b)(4)(B) of the National Labor Relations Act, which forbids what is generally known as secondary pressure; that is, union coercion directed at a neutral employer with the object of inducing it to cease doing business with an employer with whom the union has a labor dispute. However, although the two sections share the word "coerce," the Board properly

found that their contexts are quite different. There is no counterpart to the *Carey* case for § 8(b)(4)(B); there is no statutorily mandated labor policy of encouraging private settlement of disputes over secondary pressure comparable to the policy of encouraging private settlement of jurisdictional disputes. Consequently, the Board can properly find that the word "coerce" takes on a different meaning in § 8(b)(4)(D) cases than it bears in § 8(b)(4)(B) cases.

We also find reasonable the Board's determination that the filing of a grievance is coercive after the issuance of a § 10(k) award but not before. As we observed in *Sea–Land,* the Board may properly seek to prevent what is in effect a collateral attack on its § 10(k) award. *See* 884 F.2d at 1413. Hence, although the conduct of the union and the economic impact of its grievances may be the same before and after the issuance of the § 10(k) award, the Board may reasonably decide that the national labor policy favoring final settlement of jurisdictional disputes once the Board's authority has been properly invoked, *see NLRB v. Radio Engineers,* 364 U.S. 573, 576–77, 81 S.Ct. 330, 332–33, 5 L.Ed.2d 302 (1961), makes that conduct illegal after the issuance of the § 10(k) award but not before.

We therefore uphold the Board's ruling that the filing of a grievance in a jurisdictional dispute, before the Board has issued a § 10(k) award to settle the dispute, is not a violation of § 8(b)(4)(D). The petition for review is accordingly *Denied.*