**INTERNATIONAL LONGSHOREMEN'S AND WAREHOUSEMEN'S UNION, LOCAL 14, AFL–CIO, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 95–1446.**

United States Court of Appeals,
District of Columbia Circuit.

Argued April 19, 1996.

Decided June 7, 1996.

**648**

Richard S. Zuckerman, San Francisco, CA, argued the cause and filed the briefs for petitioner.

Meredith L. Jason, Attorney, National Labor Relations Board, argued the cause for respondent, with whom Linda R. Sher, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, and Linda Dreeben, Supervisory Attorney, were on the brief.

Before: EDWARDS, Chief Judge, BUCKLEY and SENTELLE, Circuit Judges.

Opinion for the Court filed by Chief Judge EDWARDS.

HARRY T. EDWARDS, Chief Judge:

Following a section 10(k) hearing on an alleged work "jurisdictional dispute," *see* 29 U.S.C. § 160(k) (1994), the National Labor Relations Board ("NLRB" or "Board") found that the assignment of certain "chip-loading" work by Sierra Pacific Industries ("SPI") to its unrepresented employees was an original assignment of new work. Pursuant to this finding, the Board further found reasonable cause to believe that Local 14 of the International Longshoremen's and Warehousemen's Union ("Local 14" or "Union") had violated section 8(b)(4)(D) of the National Labor Relations Act ("NLRA" or "Act"), 29 U.S.C. § 158(b)(4)(D) (1994), by picketing to force the assignment of the disputed SPI work to its members. When the Union refused to refrain from picketing, the Board then took action on an unfair labor practice complaint, and determined that the actions of Local 14 violated section 8(b)(4)(D) of the Act.

The Union petitions for review of the Board's finding that it engaged in an unfair labor practice by picketing a dock and harbor used by SPI for wood chip-loading operations. The Union contends that, because there was no "jurisdictional dispute," the Board had no authority to act pursuant to section 10(k); alternatively, the Union claims that, even if there was a jurisdictional dispute to be resolved, the Board's decision that the wood chip-loading work should be allocated to SPI's own employees instead of Union members was arbitrary and capricious. Because the Board retains broad discretion in defining what constitutes a jurisdictional dispute under section 10(k) of the NLRA, and is afforded considerable leeway in resolving an underlying work dispute, we can find no valid ground to overturn the judgment of the Board in this case. Accordingly, the petition for review is denied, and the Board's cross-petition for enforcement of its Order is granted.

## I. BACKGROUND

### A. The Dispute

Local 14 represents longshore workers who perform work under the Pacific Coast Longshore Contract Document ("PCLCD"), a multi-employer collective bargaining agreement between the Pacific Maritime Association ("PMA") and affiliated local unions, including Local 14. Under the PCLCD, Local 14 members obtain work through a dispatch hall on a rotational basis. When a ship or barge arrives in port, a longshore workforce is dispatched through the hall to perform the stevedoring operation at a dock, after which the force returns to the hall for future dispatches. Under the rotational system, work opportunities are shared by all members of Local 14.

Local 14's work has traditionally consisted of the loading of logs, lumber, pulp, and wood chips aboard ships and barges in the Port of

Eureka, California. Virtually all of the Union's stevedoring work has been performed through the Westfall Stevedore Company ("Westfall"). From about 1973 to October 1993, all wood chips loaded in Eureka were loaded at the dock of North Coast Exports ("North Coast"), apparently because it was then the only facility suited for such work. Whenever vessels were to be loaded with wood chips at North Coast, Westfall hired workers through Local 14 to perform the loading.

SPI, a privately-held corporation engaged in the manufacture of lumber and other wood products in northern California, was one of the companies that regularly delivered wood chips to North Coast. Although SPI itself is not covered by the PCLCD, it was SPI's practice to deliver wood chips to the dock, where Union members working under Westfall would then load them onto barges.

Around January 1993, Louisiana–Pacific ("L–P") purchased the North Coast facility. After the purchase, L–P continued to use Westfall and Local 14 to load wood chips, and SPI continued to sell wood chips to L–P, dropping them at the dock to be loaded by Union members. This arrangement continued until the fall of 1993, when SPI decided that it would be more economically advantageous for it to sell its wood chips directly to a pulp manufacturer under a long-term agreement than to continue to sell its chips to a middleman, such as L–P. To this end, SPI leased a dock, known as the "14th Street Dock," across the bay from L–P's site.

The 14th Street Dock had been used for loading and discharging logs and lumber (with such work performed by Westfall using Local 14 workers), but wood chips had never been processed at the 14th Street Dock until SPI invested significant capital to install wood chip-loading machinery there in late 1993. Once SPI's operations were up and running at the 14th Street Dock, logs and lumber continued to be loaded by Union members, but SPI began using its own, unrepresented employees to load the wood chips.

Under the system installed by SPI, the chip-loading process begins when trucks from SPI's sawmills dump their loads in the yard at the 14th Street Dock, at which point employees sort and stockpile the chips. When a barge arrives to transport the chips, employees use front-end loaders to push the chips onto a conveyor belt in a pit, and the chips are then moved along a series of conveyor belts to the dock, where they are downloaded onto the barge. The speed of the conveyor system and the number of chips moving through the system are controlled by a "button man" sitting in a control booth approximately 60 feet above the conveyor system. SPI employees perform all of the labor required in this process as well as some related welding and electrical work. The SPI employees are also skilled in repairing and maintaining the chip-loading system and the loading equipment.

On several occasions after SPI leased the 14th Street Dock, an owner of Westfall approached SPI and asked for a contract to run SPI's wood chip conveyor system. He put forth proposals under which SPI would have subcontracted the chip-loading work to Westfall, which would then have hired Local 14 members under the PCLCD to perform the button-man work. He also stated that Local 14's members were demanding SPI's chip-loading work. SPI management refused to subcontract the chip loading to Westfall on the ground that it would result in added costs.

On November 29, when the first barge arrived at the 14th Street Dock, the Union picketed outside the gate to the dock, carrying signs that read, "Unfair to the ILWU." Later that day, SPI's human resources manager and manager of corporate affairs, Ed Bond, met with Westfall and Union officials. The Union officials said that the chip-loading work was within their jurisdiction and they wanted it. Throughout December, January, and February, on the twelve occasions when barges were loaded, the Union picketed outside the gate to the dock.

On February 10, 1994, about 30 or 40 pickets were at the gate, some carrying signs saying, "Sierra Pacific unfair to ILWU." There were also four or five boats in the harbor, with signs and pickets aboard, that interfered with tugboat and barge activity in

the harbor. Later that day, Bond met with Westfall and Union officials again. While waiting for the meeting to begin, Union officials handed Bond a press release that stated, in part, "[T]he work of loading the Barges is ours." *See* Joint Appendix ("J.A.") 202.

## B. Proceedings Before the Board

SPI filed unfair labor practice charges alleging that the Union had violated section 8(b)(4)(D) of the Act, which prohibits "coerc[ing]" any person engaged in commerce, where an object thereof is

> forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class, unless such employer is failing to conform to an order or certification of the Board.

29 U.S.C. § 158(b)(4)(D) (1994). Thereafter, pursuant to section 10(k) of the Act, 29 U.S.C. § 160(k) (1994), the Board held a hearing to resolve the underlying work-assignment issue.[1] The Union and SPI appeared at the hearing and addressed the issues as to whether a jurisdictional dispute existed and to whom the disputed work should be assigned.

On August 24, 1994, the Board issued a decision on the basis of the record made before the hearing officer. *See International Longshoremen's & Warehousemen's Union, Local 14*, 314 N.L.R.B. 834, 1994 WL 461757 (1994). The Board found that SPI's "assignment of the chip-loading work to its unrepresented employees was an original assignment of new work," and, thus, the Union's actions could not be considered efforts to preserve work. *Id.* at 836. The Board also held that it had jurisdiction to consider the work assignment issue under section 10(k). Finally, the Board found reasonable

cause to believe that the Union had violated section 8(b)(4)(D) of the NLRA by picketing to force the assignment of SPI's button-man work to its members. Because the parties stipulated that they had not agreed on a voluntary method for resolving the dispute, *id.* at 835, the Board determined that it had jurisdiction to assign the disputed work. Based on the factors of employer preference and practice, and economy and efficiency of operations, the Board awarded the work to SPI's employees. The Board declared that the Union was not to use means proscribed by section 8(b)(4)(D) to force SPI to assign the disputed work to Union members and directed the Union to notify the Board's Regional Director within ten days as to whether it would refrain from such conduct. *Id.* at 837.

The Union's failure to submit the requested assurance led to the issuance of a complaint by the Board's General Counsel, alleging that the Union had violated section 8(b)(4)(i) and (ii)(D) of the Act. In response, the Union admitted its failure to notify the Regional Director of its intention to comply with the Board's determination, but asserted that it had refused to do so in order to obtain judicial review of the Board's decision.

The parties entered a stipulation and moved to transfer the proceeding to the Board. It was agreed that the record would consist of exhibits attached to the stipulation, and that there would be no further hearing or involvement of an Administrative Law Judge. Thus, with the Board's approval, the case proceeded directly to the Board for findings of fact, conclusions of law, and issuance of an order.

In briefs submitted to the Board, the Union once again argued that it had engaged in lawful picketing in furtherance of a work preservation claim, and asserted that the Board's assignment of the button-man work

---

1. 29 U.S.C. § 160(k) (1994) provides:

 Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4)(D) of section 158(b) of this title, the Board is empowered and directed to hear and determine the dispute out of which such unfair labor practice shall have arisen, unless, within ten days after notice that

 such charge has been filed, the parties to such dispute submit to the Board satisfactory evidence that they have adjusted, or agreed upon methods for the voluntary adjustment of, the dispute. Upon compliance by the parties to the dispute with the decision of the Board or upon such voluntary adjustment of the dispute, such charge shall be dismissed.

to SPI's employees was arbitrary and capricious. The Board found "no merit in [the Union's] contentions because they raise[d] arguments previously considered and rejected by the Board." *International Longshoremen's & Warehousemen's Union, Local 14,* 318 N.L.R.B. No. 55 at 3 (1995) ("Order"), *reprinted in* J.A. 179, 181. Thus, the Board found "no matters outstanding for resolution," and concluded that the Union violated section 8(b)(4)(D) of the Act by picketing SPI to force it to assign its button-man work to Union members. *Id.* The Union was ordered to cease and desist from such actions.

In its petition for review, the Union contends that this case has never involved a "jurisdictional dispute," because the Union has acted solely to preserve work. Thus, according to the Union, the Board lacked statutory authority to treat this matter as if it involved a section 10(k) issue. The Union also asserts that, even if the Board had jurisdiction, its award of the button-man work to SPI employees was arbitrary and capricious. The Board cross-petitions for enforcement of its Order.

## II. DISCUSSION

### A. Work–Assignment Awards Under Section 10(k)

■ Section 8(b)(4)(D) of the Act, 29 U.S.C. § 158(b)(4)(D) (1994), makes it unlawful for a union to act to "coerce" an employer with an object to force the employer to assign work to employees in a particular labor organization rather than to another group of employees. Upon a charge of a violation of this section, the Board is to suspend proceedings on the charge pending its consideration of the underlying dispute under section 10(k) of the Act. *See NLRB v. Plasterers' Local Union No. 79,* 404 U.S. 116, 123–24, 92 S.Ct. 360, 365–66, 30 L.Ed.2d 312 (1971). When the Board is faced with a dispute "between two or more groups of employees over which is entitled to do certain work for an employer," it is a dispute within the Board's jurisdiction under section 10(k). *NLRB v. Radio & Television Broadcast Engineers Union, Local 1212,* 364 U.S. 573, 579, 81 S.Ct. 330, 334–35, 5 L.Ed.2d 302 (1961) ("CBS").

■ The Board exercises its authority over "jurisdictional disputes" by determining whether there is reasonable cause to believe (1) that section 8(b)(4)(D) has been violated and (2) that the parties are unable to settle the dispute voluntarily. *See International Longshoremen's & Warehousemen's Union v. NLRB,* 884 F.2d 1407, 1409 n. 5 (D.C.Cir. 1989) ("*Sea–Land*"). Once these elements are established, the Board holds a hearing to determine which group of employees is entitled to perform the disputed work. *See CBS,* 364 U.S. at 586, 81 S.Ct. at 338. However, the Board's resolution of this question does not immediately result in a reviewable order. Instead, the Board issues a request that the competing employee groups comply with its work-assignment award. If a rival employee group does not comply, its actions may then become the subject of an unfair labor practice proceeding under section 8(b)(4)(D), through which the Board's section 10(k) award may be reviewed. *See International Longshoremen's & Warehousemen's Union, Local 62–B v. NLRB,* 781 F.2d 919, 923 (D.C.Cir.1986) ("*Alaska Timber*").

■ The scope of our review of the Board's section 10(k) orders is limited. As this court explained in *Alaska Timber,*

[i]n reviewing § 10(k) orders, as implemented by § 8(b)(4)(D) proceedings, we perform a limited inquiry. To the extent that the Board decisions reflect conclusions as to factual matters, for which there is "substantial evidence on the record considered as a whole," we must defer to the Board's conclusion. 29 U.S.C. § 160(e) (1982). To the extent that the Board decisions reflect a legal conclusion, however, we must determine whether the decisions were "arbitrary and capricious."

781 F.2d at 923.

### B. The Definition of a Jurisdictional Dispute

■ The critical issue in this case is whether the dispute between Local 14 and the SPI employees was jurisdictional. In *Alaska Timber,* we indicated that, as a general matter, there is no jurisdictional dispute when (1) one of two potentially competing employee groups explicitly disclaims a de-

mand for the work, (2) one of the competing employee groups renounces its claim to the work, or (3) the competing claims have been resolved. *Id.* Further, we noted that the quintessential jurisdictional dispute involves a conflict "between rival groups of employee[s]" where "the employer ordinarily stands aloof," with no particular interest in the outcome. *Id.* at 923–24; *see also CBS,* 364 U.S. at 579, 81 S.Ct. at 334 ("[I]n most instances, [the quarrel] is of so little interest to the employer that he seems perfectly willing to assign work to either [group of employees] if the other will just let him alone."). Thus, we summarized the model jurisdictional dispute as one "embod[ying] two characteristics: first, the employer faces a jurisdictional dispute that is not of his own making and in which he has no interest; second, the dispute is between two employee groups." *Alaska Timber,* 781 F.2d at 924.

Local 14 argues for a very rigid application of the two-prong model laid out in *Alaska Timber.* According to the Union, the Board had no authority to award the button-man work to SPI employees because, far from being disinterested, SPI actually instigated this dispute by moving its wood-chip operations to the 14th Street Dock, and because the SPI employees themselves were not in a dispute with the Union employees over the work. Indeed, the Union asserted that the SPI employees would lose nothing (at least not in the short-term) if the Union took over the button-man work.

The problem with the Union's position is that it reads too much into *Alaska Timber.* That decision does not, as the Union would have it, set an absolute standard or state the final word on when disputes qualify as jurisdictional. Rather, as the court makes clear, the "Board must decide whether cases that do not precisely fit the model ... are nevertheless sufficiently like that two-part model to warrant intervention by the Board." *Id.; see also Highway Truckdrivers & Helpers, Local 107 (Safeway Stores, Inc.),* 134 N.L.R.B. 1320, 1323 (1961) (The Board noted that the "normal" section 10(k) situation was one where "the employer is willing to assign the work to either group if the other will just let him alone," but noted that it did "not

mean to suggest that this is the only kind of situation where Section 10(k) is applicable."). Thus, this issue, like a number of others arising under the NLRA, is one in which the Board must use its expertise to determine, on a case-by-case basis, how to apply the law. And, pursuant to the precepts of *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984), we must defer to the Board's reasonable judgments regarding applications of the NLRA.

■ Given this deference, we have no difficulty upholding the Board's determination in this case. The Board rightly recognized that, as *Alaska Timber* itself acknowledged, there is no absolute requirement that a jurisdictional dispute involve two competing unions. *See* 781 F.2d at 924 (citing *Millwrights, Piledrivers, Divers, Highway Construction, AFL–CIO, Local Union No. 1026,* 266 N.L.R.B. 1049, 1051, 1983 WL 25039 (1983)); *see also CBS,* 364 U.S. at 584, 81 S.Ct. at 337 (The Court acknowledged "the fact that § 10(k), like § 8(b)(4)(D), extends to jurisdictional disputes between unions and unorganized groups."). Moreover, the fact that one group of employees is actually doing the work in question can reasonably be considered evidence of their claim to that work. *See Alaska Timber,* 781 F.2d at 924 (citing *International Union of Operating Engineers, Local 926,* 254 N.L.R.B. 994, 996, 1981 WL 20177 (1981)). Further, just because SPI employees may not have voiced a concern about keeping the button-man work does not indicate that they would not protest if that work were actually taken from them. In the instant case, if "the origins of the dispute" are considered, *see Alaska Timber,* 781 F.2d at 925, it is clear that there was sufficient evidence for the Board to conclude that Local 14 and SPI employees were rivals for the button-man work. The Board was not required to elicit testimony from SPI employees (as suggested by the Union) to prove more.

Consideration of the origins of this dispute not only bolsters the Board's finding that there was a *de facto* dispute between employee groups, but also demonstrates that the Board reasonably concluded that the conflict

was not truly *instigated* by SPI, as that concept has evolved in the case law. The reason why there is any concern over employer "instigation" is because, in instances where a union's claim really is focused on "work preservation" (and not a "jurisdictional dispute"), it would be unfair to allow an employer to seek redress under sections 10(k) and 8(b)(4)(D), and thus deny the union a right to use economic weapons otherwise available to it. But this concern can be carried too far, for it is often the case that an employer has an interest in the outcome of a jurisdictional dispute. So if the notion of "instigation" is somehow construed to be coterminous with an employer's interest in the outcome, the Board would be hard-pressed to find *any* jurisdictional disputes except in those rare cases in which the employer truly had not one iota of preference as to the outcome. Such a result would be absurd and analytically dissatisfying.

■ Thus, it is not surprising that the Supreme Court has recognized that an employer's interest in the outcome of a jurisdictional dispute varies in every case. *See Plasterers'*, 404 U.S. at 124, 92 S.Ct. at 366 ("It may be that in some cases employers have no stake in how a jurisdictional dispute is settled.... Other employers ... are not neutral and have substantial economic interests in the outcome of the § 10(k) proceeding."). According to the Court, sections 10(k) and 8(b)(4)(D) "were enacted to protect employers who are partisan in a jurisdictional dispute as well as those who are neutral." *Id.* at 130, 92 S.Ct. at 369.[2] A necessary corollary is that an employer need not be indifferent to the outcome of a labor dispute in order for the dispute to be deemed jurisdictional.

■ In this case, SPI admits that it would prefer for its own employees to perform the button-man work, noting that allocation of that task to Union members would be less efficient and more costly. Its move to the 14th Street Dock was driven by similar concerns, because, by eliminating the middleman in marketing its wood chips, SPI could realize substantial savings. The fact that SPI made a business decision to expand its operations in a search for profits, and thereby prompted a labor dispute, does not mean that SPI cannot be afforded the protection of the Act. As this court stated in *Sea–Land*, "if every action taken, no matter how natural or inevitable a business step, which gives rise to a dispute between rival groups of employees, disqualified an employer from section 8(b)(4)(D) relief, that section would become a dead letter." 884 F.2d at 1412.

SPI's move to the 14th Street Dock is no different from the employer's decision in *Sea–Land* to move to a new dock in order to eliminate inefficiencies due to overcrowding. *See id.* Just as the employer in *Sea–Land* was free to choose between its own Teamster employees and the Longshoremen's union when staffing its new dock, SPI was also free to choose either its own employees or Local 14 members to operate the chip loading machinery once it made the unassailable decision to relocate. SPI's decision to use its own employees was a logical extension of its previous decision to avoid the middleman in its chip business. SPI was not looking to do battle with Local 14; rather, it sought to improve its operations and save money by creating a new position. Local 14 was not "supplanted," because the work it sought was not work that it had ever done before.

Although the facts presented in this case also bear some resemblance to those presented in *Alaska Timber*, where this court overruled the Board's finding of a jurisdictional dispute, there is at least one critical difference. In *Alaska Timber*, the employer unilaterally changed the long-standing loading practices at its own dock, thereby replacing longshoremen with its own employees. *See* 781 F.2d at 920–21. As this court subsequently explained, "[t]he *Alaska* employer's shift in business practice seems to have been designed totally to supplant the Longshoremen with its own employees." *Sea–Land*, 884 F.2d at 1411. Here, there is no evidence that SPI changed its operations in order to

---

2. *See also Sea–Land*, 884 F.2d at 1412 n. 7 ("That the employer may prefer one group of employees over another ... does not render a dispute non-jurisdictional. Indeed, in deciding Section 10(k) proceedings, the Board gives weight to employer preference.").

avoid the Union. Indeed, SPI had no direct relationship with the Union in this case.[3]

 Finally, we also reject the contention that Local 14's picketing was somehow protected by the Act as a work preservation effort. Although Union members loaded chips dropped off by SPI at L–P's dock, they had never loaded chips at the 14th Street Dock. Further, SPI is not a member of the PMA, nor is it a party to the PCLCD. Thus, the button-man work at issue was new work that did not "belong" to the Union by prior practice or contract. *See, e.g., Bloomsburg Graphic Communications Union, Local 732–C,* 308 N.L.R.B. 1190, 1192 n. 4, 1992 WL 277383 (1992) (The Board found that, when an employer moved bookbinding work to a new location, the assignment of related work was "an original assignment of new work.").[4]

### C. The Board's Allocation of the Disputed Work

 Local 14 also asserts that the Board erred in assigning the work to SPI's employees. In deciding section 10(k) work-assignment disputes, the Board routinely considers:

the skills and work involved, certifications by the Board, company and industry practice, agreements between unions and between employers and unions, awards of arbitrators, joint boards, and [unions] in the same or related cases, the assignment made by the employer, and the efficient operation of the employer's business.

3. SPI's action is also markedly different from a situation in which the employer has control over one group of employees, and then replaces them with other employees. *See, e.g., USCP–WESCO, Inc. v. NLRB,* 827 F.2d 581, 585 (9th Cir.1987) (There was no jurisdictional dispute when an employer subcontracted work away from its own represented employees to the rival employees of another contractor.); *Alaska Timber,* 781 F.2d at 925–26 (There was no jurisdictional dispute when an employer usurped and reassigned work previously performed by union members in order to avoid dealing with the union and to protect its own employees.); *Safeway Stores, Inc.,* 134 N.L.R.B. at 1323 (There was no jurisdictional dispute when Safeway reassigned work from union drivers, who had performed the work for over ten years, to members of other unions.).

4. The Union argues that the Supreme Court's decisions in *National Woodwork Manufacturers*

*International Ass'n of Machinists, Lodge 1743 (Jones Construction Co.),* 135 N.L.R.B. 1402, 1410–11 (1962).

In this case, the Board considered the factors of certification and collective bargaining agreement, company preference and practice, area and industry practice, relative skills, and economy and efficiency of operations. The Board found that, although area and industry practice generally favored the Union, company preference and practice and economy and efficiency of operations favored an award to SPI's employees. The other factors did not favor either employee group. The Board concluded that, after considering all relevant factors, the work in dispute should be performed by SPI's employees. The Board's findings of fact are supported by substantial evidence, and it does not appear that the Board overlooked any critical factors. Thus, its award to SPI's employees was neither arbitrary nor capricious, and the Union's petition for review of the award is denied.

### III. Conclusion

The Union's petition for review of the Board's Order is denied, and the Board's cross-petition for enforcement is granted.

*So ordered.*

*Ass'n v. NLRB,* 386 U.S. 612, 635, 87 S.Ct. 1250, 1263, 18 L.Ed.2d 357 (1967), *NLRB v. International Longshoremen's Ass'n,* 447 U.S. 490, 506–08, 100 S.Ct. 2305, 2314–16, 65 L.Ed.2d 289 (1980), and *NLRB v. International Longshoremen's Ass'n,* 473 U.S. 61, 77, 105 S.Ct. 3045, 3054–55, 87 L.Ed.2d 47 (1985), support its claims that the picketing involved an effort to preserve work. These cases are plainly distinguishable because they involved disputes between employers and unions regarding the proper interpretation of existing collective bargaining agreements. In this case, SPI has never been party to a collective bargaining agreement with the Union; indeed, when SPI wood chips were formerly handled at the North Coast/L–P dock, it was never at the direction or for the direct benefit of SPI.