**INTERNATIONAL LONGSHOREMEN'S & WAREHOUSEMEN'S UNION, LOCAL 62–B, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 84–1488.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 31, 1985.

Decided Jan. 21, 1986.

---

Richard S. Zuckerman for petitioner.

William H. Carder entered an appearance, for petitioner.

Peter Winkler, Atty., N.L.R.B. with whom Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B. was on the brief, for respondent.

Before MIKVA and STARR, Circuit Judges, and McGOWAN, Senior Circuit Judge.

Opinion for the Court filed by Senior Circuit Judge McGOWAN.

McGOWAN, Senior Circuit Judge:

In this case, the National Labor Relations Board ("Board") held that the International Longshoremen's and Warehouse-men's Union, Local 62–B ("Union") violated the National Labor Relations Act, § 8(b)(4)(B), 29 U.S.C. § 158(b)(4)(B) (1982), and § 8(b)(4)(D), 29 U.S.C. § 158(b)(4)(D) (1982), when members of the Union, who are employed by a stevedoring company, picketed in the area of a timber company's docking facilities. We hold, however, that § 8(b)(4)(D) of the Act does not apply in this situation. We therefore enforce the Board's order only insofar as it relates to § 8(b)(4)(B) of the Act.

## I. BACKGROUND

### A. The Dispute

The Alaska Timber Corporation ("ATC"), formed some 15 years ago, produces heavy lumber at its facilities on Prince of Wales Island, Klawock, Alaska. ATC owns a dock facility at Klawock from which it ships its products. Prior to 1981, ATC contracted with its customers to sell its products "FAS," or "free along side." Pursuant to these contracts, ATC would deliver lumber to the docking facilities at Klawock. ATC's customers were responsible for loading the lumber onto ships for transportation to the customer's port. ATC's customers would ordinarily contract with a longshore service company, South East Stevedoring Company ("SES"), to load the ships for transportation. The stevedoring company, in turn, employed members of the Union.

In late 1980, ATC President Edward Head informed SES that ATC was changing its method of billing and shipment from FAS to "FOB" ("free on board"). Under this method, the price of lumber would include delivery from ATC's sawmill to the dock and subsequent loading on the customers' ship. The obvious result was that SES would no longer perform a function in the loading operation.

On January 9, 1981, the *Eastern Hope*, which had been chartered by the Yuasa Trading Company of Japan to pick up a load of lumber from ATC, arrived at Klawock. The *Eastern Hope* was the first ship to be loaded under ATC's new FOB

policy. To help with the loading of the ship, ATC recalled some employees who had been laid off due to lack of work.

On January 10, 1981, Jay Browne and Larry Cotter, officials of the Union, called Mr. Head of ATC. Browne and Cotter told Head that they wanted Union members to load the *Eastern Hope.* Head explained that ATC had changed its sales policy from FAS to FOB, and thus refused to accept the proposal to have Union members load the ship. The Union officials then informed Head that the Union would picket the ship when loading began.

ATC began loading the *Eastern Hope* on January 11, 1981. The loading operation, performed by ATC's sawmill employees, took about nine days. As the loading began, the Union commenced picketing the ATC facility. The picketing took place at the facility's two entrance gates and lasted from 7 a.m. to 6 p.m. The pickets carried signs which read "Picket Informational/ATC Unfair Substandard/ILWU 62–B."

On January 18, as the loading neared completion, the Union commenced a water-based picket. A small boat patrolled along the outboard side of the *Eastern Hope* carrying the same picket signs as the land-based pickets carried. At night, the boat remained beside the ship. The boat picketed from January 18 through January 22.

ATC employees completed the loading of the ship on January 19. On January 20, the pilot hired to take the ship out of port arrived at one of ATC's entrance gates. The pilot, a member of the South Eastern Pilots Association, refused to board the vessel after seeing the picket line. On January 21, the pilot returned, but again refused to cross the picket line. The next day, ATC employees cut the *Eastern Hope* adrift from the dock. The pilot then crossed the picket line, boarded a tugboat, and performed his duties. The Union ceased picketing when the pilot boarded the ship.

### B. Board Proceedings

On January 21, 1981, ATC filed an unfair labor practice charge against the Union. The Regional Director investigated ATC's charges but declined to issue a complaint. ATC filed an appeal. On May 22, 1981, the General Counsel for the Board sustained ATC's appeal in part, and remanded the case.

On June 8, 1981, the Regional Director issued a complaint which alleged that the Union had violated § 8(b)(4)(B) and § 8(b)(4)(D) of the Act. Section 8(b)(4)(B) generally prohibits secondary boycotts, and § 8(b)(4)(D) prohibits picketing in certain jurisdictional disputes between labor groups.[1] With respect to the § 8(b)(4)(D)

---

1. In Section 8(b) of the Act, 29 U.S.C. § 158(b) (1982), Congress has provided, in pertinent part:

    It shall be an unfair labor practice for a labor organization or its agents—

    \* \* \* \* \* \*

    (4)(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

    \* \* \* \* \*

    (B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to

cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title: *Provided,* That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing;

    \* \* \* \* \* \*

    (D) forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class, unless such employer is failing to conform to an order or certification of the Board determining the bargaining representative for employees performing such work[.]

charges, the Regional Director also gave notice of a hearing, pursuant to § 10(k) of the Act,[2] to resolve the alleged jurisdictional dispute.

The § 10(k) hearing took place on June 25, 1981. Based on that hearing, a three-member panel of the Board, on May 27, 1982, issued its "Decision and Determination of Dispute." *International Longshore Workers Union, Local No. 62-B (Alaska Timber Corp.)*, 261 NLRB 1076 (1982). The Board found reasonable cause to believe that § 8(b)(4)(D) of the Act had been violated, *id.* at 1077–78, and held that the employees of ATC were entitled to perform the work of loading lumber for shipment from ATC's docks. *Id.* at 1079.

On June 2, 1982, pursuant to the Board's decision, the Compliance Officer for the Region asked the Union to notify him whether the Union would comply with the Board's determination. The Union did not respond. Thereafter, on June 18, 1982, the Regional Director issued a consolidated complaint, which alleged that the Union had violated both § 8(b)(4)(B) and § 8(b)(4)(D) of the Act. The Union filed an answer to the complaint, and the case was assigned to an Administrative Law Judge ("ALJ").

On September 23, 1983, the ALJ issued his decision, holding that the Union did not violate § 8(b)(4)(B) of the Act, but that it had violated § 8(b)(4)(D). *International Longshoremen's & Warehousemen's Union Local 62-B (Alaska Timber Corp.)*, 271 NLRB 1291, 1294 (1984) (Appendix, ALJ Decision). Both the Union and ATC filed exceptions to this decision. On August 30, 1984, a three-member panel of the Board issued a "Decision and Order," which adopted the ALJ's conclusion as·to the § 8(b)(4)(D) charge, but rejected the

conclusion as to the § 8(b)(4)(B) charge. *Id.* at 1291 (NLRB Decision and Order). The Board's order thus found the Union in violation of both § 8(b)(4)(D) and § 8(b)(4)(B). The Board ordered, *inter alia*, that the Union cease and desist from coercive efforts to force ATC to assign the disputed work to Union members. *Id.* at 1293. Thereafter, the Union petitioned this court for review of the Board's order and the Board cross-petitioned for enforcement of its order.

## II. ANALYSIS

Although both the § 8(b)(4)(B) and § 8(b)(4)(D) charges arose out of the same dispute, the theoretical bases for each charge are different. We therefore consider the applicability of each section separately. We begin with the section that we find does not apply in this situation.

### A. *The § 8(b)(4)(D) Claim*

In § 8(b)(4)(D), Congress generally prohibited efforts to coerce an employer to assign work to a particular labor organization where a jurisdictional dispute exists between labor groups. In enforcing this section, the Board is required to "hear and determine the dispute . . . ." Section 10(k), 29 U.S.C. § 160(k) (1982); *see NLRB v. Radio & Television Broadcast Engineers Union, Local 1212*, 364 U.S. 573, 586, 81 S.Ct. 330, 338, 5 L.Ed.2d 302 (1961) (indicating that Board may not decide unfair labor practice charge without first resolving jurisdictional dispute). The purpose of this hearing is to relieve the employer of the burden of choosing between employee groups that are competing for the assignment of work. *Id.* at 579, 81 S.Ct. at 334.

The Board followed the § 10(k) procedure in this case. In its May 27, 1982

2. Section 10(k) of the Act, 29 U.S.C. § 160(k) (1982), provides:

Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4)(D) of section 158(b) of this title, the Board is empowered and directed to hear and determine the dispute out of which such unfair labor practice shall have arisen, unless, within ten days after no-tice that such charge has been filed, the parties to such dispute submit to the Board satisfactory evidence that they have adjusted, or agreed upon methods for the voluntary adjustment of, the dispute. Upon compliance by the parties to the dispute with the decision of the Board or upon such voluntary adjustment of the dispute, such charge shall be dismissed.

§ 10(k) order, the Board addressed the question whether there was reasonable cause to believe that § 8(b)(4)(D) had been violated. *International Longshore Worker's Union, Local No. 62–B (Alaska Timber Corp.),* 261 NLRB 1076, 1077 (1982). The Board found that there was such reasonable cause. The Board concluded, in particular, that the Union's object in picketing at ATC's docking facilities was to force ATC to assign the disputed work to the employees represented by the Union rather than to ATC's employees. *Id.* In addition, the Board found that the dispute was not simply a question of the preservation of work performed by Union members. Rather, according to the Board, the Union acted to satisfy objectives elsewhere. *Id.* at 1077 n.4. After finding that a jurisdictional dispute existed, the Board went on to hold that an assessment of the relevant factors in the case required assignment of the work to ATC employees. *Id.* at 1079.

Section 10(k) orders are not immediately reviewable. Instead, the order must be implemented by a request from the Board that the employee group comply with the jurisdictional award. If the employee group does not comply, this behavior may become the subject of an unfair labor practice proceeding under § 8(b)(4)(D).

■ In reviewing § 10(k) orders, as implemented by § 8(b)(4)(D) proceedings, we perform a limited inquiry. To the extent that the Board decisions reflect conclusions as to factual matters, for which there is "substantial evidence on the record considered as a whole," we must defer to the Board's conclusion. 29 U.S.C. § 160(e) (1982). To the extent that the Board decisions reflect a legal conclusion, however, we must determine whether the decisions were "arbitrary and capricious." *See NLRB v. United Association of Journeymen & Apprentices of the Plumbing & Pipefitting Industry, Local No. 741,* 704 F.2d 1164, 1166 (9th Cir.1983); *NLRB v. Local Union No. 584, International Brotherhood of Teamsters,* 535 F.2d 205, 207 n.4 (2d Cir.1976).

We find the Board's decision in the instant case invalid as both a factual and legal matter. Despite the Board's conclusion that the Union's objective was to require assignment of the disputed work to its members, and despite the Board's conclusion that the Union's objective was not limited to preserving work at ATC's Klawock facilities, the Board's analysis is incomplete. The Board simply did not find, and there is no evidence to establish, that a jurisdictional dispute existed in this case.

■ The essence of a jurisdictional dispute in the § 8(b)(4)(D) and § 10(k) sense is the existence of "a dispute between two or more groups of employees over which is entitled to do certain work for an employer." *NLRB v. Radio & Television Broadcast Engineers Union, Local 1212,* 364 U.S. 573, 579, 81 S.Ct. 330, 384, 5 L.Ed.2d 302 (1961). Thus, for example, where one of two potentially competing unions explicitly disclaims a demand for the work at issue, no jurisdictional dispute exists. *See International Union of Operating Engineers, AFL–CIO, Local 925 (Bradshaw Industrial Coatings, Inc.),* 264 NLRB 962, 964 (1982). Similarly, even where such competing claims originally existed, no jurisdictional dispute remains once one of the competing unions renounces its claim to the work. *See Local 372, Service Employees International Union (Pepper Construction Co.),* 262 NLRB 815, 816 (1982). Moreover, once the competing claims between the employee groups have been resolved, no jurisdictional dispute exists, even if the employer protests the particular resolution. *See Teamsters, Warehousemen, Garage Employees & Helpers Union Local 839 (Shurtleff & Andrews Constructors),* 249 NLRB 176, 177 (1980).

The Board's treatment of cases where potentially competing groups of employees have renounced or resolved their claims is consistent with the purpose of § 8(b)(4)(D) and § 10(k). Congress enacted these provisions to allow for the peaceful resolution of competing claims between rival groups of employee. *See Highway Truckdrivers & Helpers, Local 107 (Safeway Stores),* 134

NLRB 1320, 1322 (1961); *see also* 93 Cong. Rec. 3424 (remarks of Rep. Hartley) (providing example of jurisdictional strikes); 93 Cong. Rec. 3227–3228 (1947) (remarks of Sen. Lucas) (same). In such disputes, the employer ordinarily stands aloof. "[I]n most instances, [the quarrel] is of so little interest to the employer that he seems perfectly willing to assign work to either [group of employees] if the other will just let him alone." *Radio Engineers*, 364 U.S. at 579, 81 S.Ct. at 334. Thus, the central problem these provisions aim to solve embodies two characteristics: first, the employer faces a jurisdictional dispute that is not of his own making and in which he has no interest; second, the dispute is between two employee groups.

Application of these provisions is not without its subtlety. The Labor Board must decide whether cases that do not precisely fit the model of a jurisdictional dispute outlined above are nevertheless sufficiently like that two-part model to warrant intervention by the Board. Thus, the Board has found that a jurisdictional dispute existed even in cases where no dispute appeared at first glance. For example, the Board has determined that it does not matter that the dispute is between a union and a group of unrepresented employees. The purpose of relieving the employer from the potentially disruptive choice is still served. *See Millwrights, Piledrivers, Divers, Highway Construction, AFL–CIO, Local Union No. 1026 (Intercounty Construction Corp of Florida)*, 266 NLRB 1049, 1051 (1983). In addition, the Board has held that, where certain employees were doing work and another group of employees demanded that work, these provisions applied. Even though the first group of employees may not have explicitly claimed the work, the fact that they were doing the work was evidence of their claim. *See International Union of Operating Engineers, Local 926 (Georgia World Congress Center)*, 254 NLRB 994, 996 (1981). Indeed, such problems may turn on very close attention to both aspects of the model of a jurisdictional dispute. For example, in *International Longshoremen's and Ware-* *housemen's Union, Local No. 8 (Collier Carbon & Chemical Corp.)*, 231 NLRB 179 (1977), the employer originally received shipments of chemicals on a freighter which it owned and which was specially constructed for hauling the chemical. The employer unloaded the ship with its own employees. Some years later, the freighter sank. The employer began to receive shipments on vessels not specially equipped for transport of the chemical. The employer hired a stevedoring company, which employed union longshoremen, to unload these vessels. Thereafter, the employer bought a new, specially equipped vessel, and announced that it would once again use its own employees to unload the shipments. The Board held, *inter alia*, that, because the employers' employees had performed the work when there was a specially equipped vessel, they had evidenced their continuing demand for the work, and a work dispute existed. *Id.* at 180. In addition to noting that the dispute was between two employee groups, however, the Board emphasized that the employer was essentially disinterested in the dispute. *Id.*

By contrast, in cases where one or the other of the central characteristics of a jurisdictional dispute did not appear, the Board has held that § 8(b)(4)(D) and § 10(k) did not apply. For example, in *Highway Truckdrivers & Helpers, Local 107 (Safeway Stores, Inc.)*, 134 NLRB 1320 (1961), Safeway employed three truck drivers, members of a union, at its Wilmington, Delaware, meat-processing plant, for 10 years. Safeway discharged the three drivers, and arranged for the driving to be done by other drivers, members of another union, who worked at Safeway's Landover, Maryland and Kearney, New Jersey, plants. The Board held that these circumstances did not present a jurisdictional dispute:

Sections 8(b)(4)(D) and 10(k) were designed to resolve competing claims between rival groups of employees, and not to arbitrate disputes between a union and an employer where no such competing claims are involved. Certainly it was

not intended that every time an employer elected to reallocate work among his employees or supplant one group of employees with another, a "jurisdictional dispute" exists within the meaning of the cited statutory provisions.

*Id.* at 1322. The Board emphasized how far the *Safeway* case departed from the model of the ordinary jurisdictional dispute:

> In the normal situation, the Section 10(k) proceeding is designed to determine which of two competing employee groups is entitled to do the disputed work. In the normal situation also, the employer is willing to assign the work to either group if the other will just let him alone. We do not mean to suggest that this is the only kind of situation where Section 10(k) is applicable. But the normal situation demonstrates how far removed is the instant case where the employer by his unilateral action *created* the dispute, by transferring work away from the only group claiming the work.

*Id.* at 1323 (emphasis in original). The Board has also held that no jurisdictional dispute existed where an employer decided to lay off a carpenter, a plumber, a painter, and an electrician after the renovation program at a hotel, in which they were involved, ended. *Seattle Building & Construction Trades Council (Seattle Olympic Hotel Co.)*, 204 NLRB 1126, 1127 (1973). Here again, the employer, not the employee groups involved, had created the dispute.

■ The facts of the case before us do not square with the model of a jurisdictional dispute. The first of the essential characteristics of a jurisdictional dispute does not appear in this case. The dispute was entirely of the employer's making, and the employer was not neutral in the dispute. The record is quite clear that ATC alone made the decision to change from FAS to FOB shipment, thus effectively reassigning the work from the stevedoring company to its own employees. *See* J.A. at 111 (statement of Edward Head, President of ATC) (indicating that ATC made the decision to change from FAS to FOB). In addition,

the company clearly had an interest in assigning the work to its own employees. *See* J.A. at 112 (statement of Edward Head (indicating that the company decided not to use the longshoremen because of shortages in longshore crews); *id.* at 194 (statement of Edward Head) (indicating that, by giving loading work to company's mill employees, company hoped to retain employees that otherwise would be laid off).

As to the second factor in the model, although it is possible to characterize this case as a dispute between employee groups, we cannot consider one factor in isolation from the other. ATC's employees performed the work after ATC reassigned the work, and in that sense one could say that they demanded the work. This fact alone, however, does not establish that a jurisdictional dispute existed. Were that the rule, an employer could always create a jurisdictional dispute between employee groups by reassigning work. The result in *Safeway*, for example, would change. In that case, the driving was originally done by one group of employees. The employer reassigned it to another group, which began to perform the work. If we were to assume that the only significant facts were that one group was performing the work, and another group was demanding the work, then *Safeway* would have been a jurisdictional dispute case. The Board decision in *Safeway*, however, makes clear that we must also consider the origins of the dispute. Where, as here, the employer created the dispute, § 8(b)(4)(D) and § 10(k) do not apply.

In its § 10(k) opinion, the Board did not mention the problem we have outlined above. The Board may either have assumed that the problem did not exist or it may have concluded that the other factors present in the case (that the object of the Union's picketing was to force the assignment of work to it and that the Union's object was not limited to preserving bargaining unit work for employees at the Klawock operation) should control its decision. In the first case, as we have seen, the Board is wrong as a factual matter. In

the second case, the Board is wrong as a matter of law. The question whether a jurisdictional dispute existed is a preliminary one, and can not be ignored.[3] Accordingly, to the extent that the Board's order is grounded in the § 10(k) decision, we will not enforce the order.

### B. *The § 8(b)(4)(B) Claim*

In § 8(b)(4)(B), 29 U.S.C. § 158(b)(4)(B) (1982), Congress generally prohibited efforts by labor organizations to coerce any person to cease doing business with any other person. Congress made clear in this section, however, that a labor organization could engage in a "primary strike" or "primary picketing." The provision thus embodies twin congressional objectives: "preserving the right of labor organizations to bring pressure to bear on offending employers in primary labor disputes and ... shielding unoffending employers and others from pressures and controversies not their own." *NLRB v. Denver Bldg. & Constr. Trades Council,* 341 U.S. 675, 692, 71 S.Ct. 943, 953, 95 L.Ed. 1284 (1951).

The Labor Board, in the instant case, found that the Union's picketing at the ATC facilities contravened the provisions of § 8(b)(4)(B). The Board reasoned that ATC was not the primary employer in the case, since the Union's members were employed by the stevedoring company, SES. *International Longshoremen's & Warehousemen's Union Local 62–B (Alaska Timber Corp.),* 271 NLRB 1291, 1292 (1984). Further, the Board noted, the Union had no intention of organizing the ATC employees. *Id.* In sum, according to the Board, "[o]n these facts, we conclude that the Respondent's [union's] action was not addressed to the labor relations of ATC vis-a-vis its own employees but rather that the Respondent's picketing was calculated to satisfy union objectives elsewhere." *Id.* at 36.

■ We agree with the Board's analysis of the problem. In doing so, we reject the two relevant arguments advanced by the Union. First, the Union argues that its picketing at ATC was primary because only ATC had the right to control the assignment of work in this case. Br. for Petitioner at 21; Reply Br. for Petitioner at 5. The main authority on which the Union relies for this proposition is *NLRB v. Enterprise Association of Steam, Hot Water, Hydraulic Sprinkler, Pneumatic Tube, Ice Machine & General Pipefitters of New York & Vicinity, Local Union No. 638 ("Pipefitters"),* 429 U.S. 507, 97 S.Ct. 891, 51 L.Ed.2d 1 (1977). We find the instant case different in several material respects.

In *Pipefitters,* a subcontractor (Hudik) had a contract with a general contractor (Austin) for the heating, ventilation, and air-conditioning work in the construction of a home for the elderly. The subcontractor, in turn, employed members of a pipefitters union. The contract between Hudik and Austin specified that Austin would purchase certain climate-control units manufactured with internal piping that would be cut, threaded, and installed at the factory. The collective bargaining agreement between the subcontractor and the union, however, required that any pipe threading and cutting be done at the jobsite. When the units arrived on the job, the union members refused to install them. Following a complaint from Austin, the Board held that this work stoppage constituted unlawful secondary pressure in that Hudik, the primary employer, could not assign the work to the union, even if it wanted to do so. *Enterprise Association of Steam, Hot Water, Hydraulic Sprinkler, Pneumatic Tube, Ice Machine & General Pipefitters of New York & Vicinity, Local Union No. 638 (The Austin Co.),* 204 NLRB 760 (1973). On petition for certiorari, the Supreme Court upheld the Board's view. *Pipefitters,* 429 U.S. at 532, 97 S.Ct. at 905.

The result in the *Pipefitters* case is hardly availing to the Union in this case, for several reasons. First, the Board and the

---

**3.** Because we hold that the question of the existence of jurisdictional dispute is controlling in this case, we need not further address the rationale advanced by the Board on the § 8(b)(4)(D) claim.

Court in that case did not use the right-of-control test to define once and for all the boundaries of legal primary activity and illegal secondary activity. Rather, the *Pipefitters* Court applied the right-of-control test to determine that the Union's goal in that case was secondary, even though its action was nominally against its employer. *Pipefitters* most assuredly does not establish the converse proposition, namely, that action against a business that is clearly not the primary employer is permissible primary activity simply because that business may have the power to fulfill the union's request. Second, the *Pipefitters* opinion explicitly stated that the right to control the assignment of work is but one factor in calculating whether the union has engaged in unlawful secondary activity. *Id.* at 524, 97 S.Ct. at 901. Finally, petitioner does not point to, nor have we found, any case in which the Board has applied *Pipefitters* to the effect that petitioner desires.[4]

█ The Union's second argument is that its members were, in effect, "employees" of ATC, since ATC's use of FAS contracts meant that the work would be assigned to the longshoremen. Br. for Petitioner at 21 n.14; Reply Br. for Petitioner at 8. In large part, this argument merely rehearses petitioner's right-of-control point. The Union argues that its picketing was not secondary because it was directed against the only entity that had the right to control the assignment of work. Alternatively, the Union argues that ATC was, in effect, the primary employer. The essential fact on which the Union relies is the same: ATC had the power to assign the work to the Union. The Board correctly found, however, that this fact did not make ATC the primary employer. The Union's members were employed by the stevedoring company, SES, which was hired by ATC's customers. There was no contractual relationship whatsoever between ATC and the employees represented by the Union.

### III. CONCLUSION

The Labor Board, in its August 30, 1984, "Decision and Order," found that the Union had violated both § 8(b)(4)(B) and § 8(b)(4)(D). *International Longshoremen's & Warehousemen's Union Local 62–B (Alaska Timber Corp.)*, 271 NLRB 1291, 1293 (1984). The Board concluded that the Union violated § 8(b)(4)(D) by picketing with the object of forcing ATC to assign work to employees represented by the Union. The Board concluded that the Union ·violated § 8(b)(4)(B) by picketing with the object of forcing ATC to cease doing business with Yuasa Trading Corp. (the owner of the *Eastern Hope*). On our analysis of the case, the Board's first conclusion must be invalidated. The Board's second conclusion must be upheld, but with a brief further comment.

It is clear that the Union's purpose in picketing at the ATC dock was to attempt to interfere with ATC's business relations so as to force ATC to either go back to its previous FAS contracts or to hire the employees represented by the Union to do the work then performed by ATC's employees. This interference specifically applied to ATC's relations with Yuasa only because Yuasa was the first customer to purchase from ATC under the new policy. We presume that the Board's order also extends to picketing involving customers other than Yuasa.

Based on the foregoing analysis, we grant petitioner's petition for review to the extent that it applies to the § 8(b)(4)(D) claim and we enforce the Board's order to the extent that it applies to the § 8(b)(4)(B) claim.

*It is so ordered.*

---

**4.** Indeed, if the principle on which petitioner relies extended to this case, the principle could not rationally be limited. One can imagine that virtually any employee group that knows that the fortunes of its employer are tied to some other business' operations could picket at that other business whenever the other business materially changes its operations.