LABORERS' INTERNATIONAL UNION OF NORTH AMERICA, AFL–CIO, LOCAL 104, Petitioner–Cross–Respondent,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent–Cross–Petitioner.

Nos. 1537, 1648, Dockets 91–4009, 91–4021.

United States Court of Appeals, Second Circuit.

Argued May 31, 1991.

Decided Sept. 24, 1991.

Theodore T. Green, Washington, D.C. (Laborers' Intern. Union of North America, AFL–CIO), for petitioner-cross-respondent.

Stephen Davis, New York City (Davis & Davis, of counsel) for petitioner-cross-respondent.

Howard E. Perlstein, Washington, D.C. (Supervising Atty., N.L.R.B., Scott D. Mac-Donald, of counsel), for respondent-cross-petitioner.

Before OAKES, Chief Judge, and KAUFMAN and WALKER, Circuit Judges.

WALKER, Circuit Judge:

The National Labor Relations Board ("NLRB or Board") seeks to enforce its decision and order finding Laborers International Local 104 ("Local 104") in violation of § 8(b)(4)(ii)(D) of the National Labor Relations Act ("NLRA"). The Board concluded that Local 104 threatened an employer in order to force the latter to assign work to Local 104, work that had previously been given to members of Sheet Metal Workers Local 28. In turn, the Board ordered Local 104 to cease and desist from all such threatening activities. Local 104 claims that the NLRB's order should not be enforced because during the mandatory NLRA § 10(k) hearing to determine which union should receive the work, the Board failed to take into account evidence that the Sheet Metal Workers' pension fund has a significant financial investment in the employer. We reject Local 104's claim of error, and enforce the decision and order of the NLRB.

## BACKGROUND

ACMAT Corporation is an asbestos removal contractor based in Hartford. Until 1987, ACMAT employed workers from different unions on a composite-crew basis, and had separate collective bargaining agreements with each union, including one with Local 104. ACMAT found that this division of labor between workers from several unions resulted in disputes over which union was entitled to perform specific tasks, friction among employees and production delays. In order to resolve these problems, ACMAT terminated these separate union agreements in late 1986 and 1987. In December 1987, after the Sheet Metal Workers' International Association ("Sheet Metal Workers") instituted a program to train its members in all aspects of the asbestos abatement process, ACMAT executed a nationwide agreement with the Sheet Metal Workers to cover all phases of ACMAT's asbestos removal work.

In August 1988, ACMAT was hired by Cross & Brown Co. to remove asbestos from the Prudential Insurance Company's offices on the sixth and eighth floors of the Pan Am building in New York City. As required by its contract with Sheet Metal Workers, ACMAT employed only workers represented by Sheet Metal Workers Local 28 to complete this job. On September 6, shortly after the project commenced, a representative from Local 104 came to the work site and demanded to be put on the payroll as a union steward. The Local 104 representative insisted that the job should be performed by Laborers rather than Sheet Metal Workers. ACMAT refused to accede to these demands. The next day two Local 104 representatives appeared and stated that they might have to take other Laborers off their jobs in other portions of the Pan Am building unless the work was reassigned to Local 104. Cross & Brown told ACMAT to stop the asbestos removal work until its labor dispute was settled.

On October 19, ACMAT attempted to resume work, but that afternoon another representative of Local 104 came to the site and demanded to be put on the payroll.

ACMAT again refused. Cross & Brown then ordered ACMAT's employees off the site, stating that it did not want any more trouble. ACMAT has not performed any further work under the contract.

## PROCEEDINGS

On September 13, 1988 ACMAT filed an unfair labor practice charge with the NLRB alleging that Local 104 had violated § 8(b)(4)(ii)(D) of the NLRA, codified at 29 U.S.C. § 158(b)(4)(ii)(D). The charge alleged that Local 104 had threatened both ACMAT and Cross & Brown in order to force ACMAT to displace employees affiliated with Sheet Metal Workers Local 28 and reassign their work to members of Local 104.

Before the Board could issue a complaint under § 8(b)(4)(ii)(D), § 10(k) of the NLRA, codified at 29 U.S.C. § 160(k), required that it conduct a hearing to determine which group of employees should be awarded the disputed work (a "10(k) hearing").[1] After seven days of hearings in the fall of 1988, the Board determined that employees represented by Sheet Metal Workers were properly entitled to jurisdiction over the work. In reaching this conclusion, the Board balanced factors derived from *Machinists Lodge 1743 (J.A. Jones Construction)*, 135 NLRB 1402 (1962) (the *"Jones* factors") including 1) employer preference and past practice; 2) economy and efficiency of operations; 3) area practice; 4) relative skill and training; 5) certifications by the Board; 6) awards of joint boards.

On August 1, 1989 Local 104 notified the Board that it would not comply with the Board's 10(k) award. The Board then issued a decision and order dated December 26, 1990, holding that Local 104 was in violation of § 8(b)(4)(ii)(D), and ordering Local 104 to cease its coercive activities against ACMAT with respect to the assignment of asbestos removal positions at the Pan Am building job-site.

Local 104 asks this court not to enforce the Board's December 26 decision on the basis that the 10(k) determination underlying it was fatally flawed by the Board's incomplete analysis of the "employer preference" factor of the *Jones* test. Specifically, Local 104 argues that the 10(k) Board refused to consider Local 104's offer of proof that: 1) the Sheet Metal Worker's pension fund has a thirty to thirty-five percent ownership interest in ACMAT, and 2) the pension fund has purchased thirty percent of an insurance company that provides liability insurance to asbestos removal contractors, including ACMAT, and is owned in substantial part by ACMAT.[2] These investments, Local 104 argues, create a conflict of interest within the union and thus the union has engaged in an unfair labor practice by representing its members in their dealings with ACMAT. Local 104 contends that this conflict undermines the legitimacy of ACMAT's preference for Sheet Metal Workers. Therefore, Local 104 maintains, by giving weight to AC-MAT's preference for Sheet Metal Workers, the Board arbitrarily and capriciously allowed its 10(k) determination to rest on an invalid employer preference.

We reject these contentions, and enforce the Board's decision and order.

---

1. The Board may issue a complaint for a violation of § 8(b)(4)(ii)(D) only if the 10(k) ruling is adverse to the union which threatened to restrain the employer, or any other person engaged in commerce, and if the union refuses to abide by the ruling. *See NLRB v. Radio and Television Broadcast Engineers Union, Local 1212*, 364 U.S. 573, 576–77, 81 S.Ct. 330, 332–33, 5 L.Ed.2d 302 (1961); *NLRB v. Plasterers' Local Union No. 79*, 404 U.S. 116, 123–124, 92 S.Ct. 360, 365–366, 30 L.Ed.2d 312 (1971).

2. These contentions by Local 104 have not yet been the subject of an evidentiary hearing, and no findings have been made with regard to them. As part of the NLRB's investigation into a separate charge by Local 104 that, in light of these investments, ACMAT and the Sheet Metal Workers' signing of a collective bargaining agreement constituted an unfair labor practice in violation of § 8(a)(1), (2), (3) and (5), and § 8(b)(1)(A), (2) and (3) of the NLRA, the Regional Director found that the Sheet Metal Workers' pension fund had a 17.9% voting interest in ACMAT, and had one member on AC-MAT's eight person board of directors. The Regional Director did not discuss the pension fund's overall ownership interest, or any investment the fund may have in an insurance company substantially owned by ACMAT.

## DISCUSSION

### A. *Standard of Review*

Since Local 104 does not dispute the Board's finding that its threats to pull workers from other jobs in the Pan Am Building amounted to a § 8(b)(4)(ii)(D) violation if the 10(k) work award was properly made against them, our review involves the propriety of that 10(k) determination. In reviewing the Board's 10(k) decision, we are bound to uphold the Board's factual findings if they are supported by "substantial evidence," and its legal determinations if they are not "arbitrary or capricious." *See NLRB v. Local 584, International Brotherhood of Teamsters*, 535 F.2d 205 (2d Cir.1976); *International Longshoremen's Union Local 62–B v. NLRB*, 781 F.2d 919, 923 (D.C.Cir.1986). Judicial review of NLRB decisions, however, does not function as a mere "rubber stamp." *Local 584, IBT*, 535 F.2d at 208. Indeed, a court will look to see whether the Board's analysis of the work jurisdiction dispute is complete. A finding that it is not complete may lead to a holding that the Board's 10(k) determination is "arbitrary or capricious." *See Int'l Longshoremen's Local 62–B*, 781 F.2d at 923, 925–26. Thus, if we find that the NLRB failed to consider a *Jones* factor crucial to its 10(k) award, we may conclude that the award is fatally flawed and vacate it. We therefore turn to the question of whether the NLRB's analysis of the "employer preference" factor was substantially incomplete.

### B. *Relevance of a Union's Substantial Investment in an Employer in Examining "Employer Preference" in 10(k) Determinations*

■ The Board's usual analysis of the "employer preference" factor of the *Jones* test is quite straightforward. The Board simply notes the employer's preference to use employees represented by one union or another, or no union at all, and further states that this factor weighs in favor of an award to the preferred employees. *See Local 1332, Longshoremen's Association (Trailer Marine Transport Corp.)*, 264 NLRB 319, 321 (1982); *UAW Local 292*

*(Delco Electronics)*, 228 NLRB 635, 637–38 (1977); *see also NLRB v. International Longshoremen's Local 50*, 504 F.2d 1209, 1220 (9th Cir.1974) ("[w]henever the Board determines that a collective bargaining contract clearly and unambiguously binds an employer to one (and only one) union, then that union is almost invariably awarded the work.")

■ The Board has, however, explored the employer's preference in greater depth when that preference "may not be representative of a free and unencumbered choice," *Teamsters Local 158 (Holt Cargo Systems)*, 293 NLRB No. 112, slip op. at 13 (April 28, 1989), but may in fact have been forced upon the employer by a union's coercive activity, i.e., threats or picketing. Where allegations of such coercion prove to be true, the Board will discount the employer's choice as a product of duress. *See International Longshoremen's Local 50 (Brady Hamilton Stevedore Company)*, 223 NLRB 1034, 1037 (1976) (employer's preference discounted because its reassignment of work to longshoremen was brought about by that union's work stoppage on other jobs).

In an attempt to apply the NLRB's recognition that an employer's coerced choice of an employee is in fact no choice at all, Local 104 argues that ACMAT's choice should be disregarded because it was, in effect, "bought" by the Sheet Metal Workers pension fund's ownership interest in ACMAT. Thus, ACMAT's choice of the Sheet Metal Workers cannot be considered a "free and unencumbered" preference. *Holt Cargo*, slip. op. at 16. In citing *Holt Cargo* and *Brady Hamilton Stevedore Company* for this proposition, however, Local 104 has construed their holdings too broadly and taken their language condemning coerced choice out of context. These cases address the situation where a union threatens an employer in order to extort employment. The preference which Local 104 asks the NLRB to condemn here, however, is not a result of threats directed by the union at the employer, but rather it is the product of a voluntary business relationship. The only entity to whom this

choice may appear coercive, or unfair, is a union that is not a party to the ACMAT–Sheet Metal Workers' collective bargaining agreement and covets the work assigned to Local 28. The fact that the Sheet Metal Workers have an ownership interest in ACMAT would appear to be more of a benefit to ACMAT than a club in the hands of the union. Arguably, a union which has invested in an employer's business has a personal stake in the success of the enterprise, and is less likely to want to disrupt it. While this might create industrial harmony, this harmony could occur at the expense of full and vigorous representation by the union of its members' interests. Whatever the merits of this issue are, however, the employer's decision to award work to a union that has a stake in its business, is not a "coerced preference" as the NLRB has thus far conceived of the term. Therefore, we are not required to disregard the employer's wishes that its work be done by a union that has invested in its business.

Even if the situation here does not amount to a coerced preference for the Sheet Metal Workers, however, Local 104 contends that we should further restrict the NLRB's practice of affording great deference to an employer's selection of employees to perform its work. Local 104 argues that a employer's preference should also be disregarded when the chosen union is so connected with the employer that the union's representation of its members in their interactions with the employer is necessarily conflicted. Local 104 maintains that this conflict of interest on the union's part becomes relevant to the validity of an employer's preference, because it is an unfair labor practice on the *employer's* part to extend recognition to such a conflicted union. Local 104 argues that an employer preference in such circumstances is irremediably tainted, and cannot be validated by a 10(k) board.

We have no quarrel with Local 104's assertion that an employer's unlawful behavior in assigning work to a particular union might be relevant in a 10(k) proceeding. Although the purpose of a 10(k) hearing is to "ensure that work disputes between two or more groups of employees are permanently and expeditiously settled," *Local 393, United Ass'n of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry, (Hall–Way Contracting Company, Inc.),* 232 NLRB 644, 645 (1977) if the Board ignored an illegal employer action which was relevant to the actual process of its work assignments, the Board's analysis of a work dispute would be incomplete, and thus arbitrary or capricious. *See Int'l Longshoremen's Local 62–B,* 781 F.2d at 923, 925–26.

We believe, however, that even if Local 104 is correct in its contention that ACMAT's recognition of the "conflicted" Sheet Metal Workers constitutes an unfair labor practice [3], this violation would not taint the work assignment process, and thus is not relevant to a 10(k) proceeding. The cases cited by Local 104 that hold that an employer's recognition of a conflicted union constitutes an unlawful practice do not arise in the work assignment setting and do not deal with a 10(k) hearing and thus are inapposite. For example in *Centerville Clinics,* 181 NLRB 135 (1970), employees of a clinic which was funded in large part by the United Mineworkers of America's ("UMWA") welfare and retirement fund changed their union affiliation from a non-UMWA union to the UMWA after two fellow employees solicited a change of representation from the employees. The clinic's board of directors consisted mainly of UMWA representatives, and the two employees who did the soliciting were both UMWA leaders as well as clinic board members. In holding that the clinic violated § 8(a)(1) and (2) of the NLRA, codified at 28 U.S.C. § 158(a)(1) and (2),[4]

---

**3.** The NLRB regional director investigating Local 104's § 8(a)(1), (2), (3) and (5) unfair labor charges based on these assertions refused to issue a complaint on the charges, and his decision was upheld by the NLRB's General Counsel.

**4.** These sections state:
 (a) It shall be an unfair labor practice for an employer—
 (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

the Board stated that the employees might well have believed that because the UMWA and the clinic were so closely linked the clinic wished them to sign with the UMWA, and that "in these circumstances the employees did not have that complete and unhampered freedom of choice to sign or not to sign ... that the Act contemplates." *Id.* at 139. Similarly, in *Medical Foundation of Bellaire*, 193 NLRB 62 (1971), the Board held that where, as in *Centerville Clinics*, employees of a medical foundation left their old union to join one which was closely linked, both financially and organizationally with the foundation, the link between the employer and union created "a proximate danger of infection of the bargaining process." *Id.* at 64 (quoting *N.L.R.B. v. David Buttrick Co.*, 399 F.2d 505, 508 (1st Cir.1968)).

Both *Centerville Clinics* and *Medical Foundation of Bellaire* deal with an employer's actions at the time its employees choose which union shall represent them. They note that an employer's nod of approval for a conflicted union at this point in time creates an impression that the employer wishes its employees to opt for the union so approved. Section 8(a)(1) and (2) forbid such action on the employer's part as an interference with a worker's right to "form labor unions" and "bargain collectively through representatives of their own choosing," or as an attempt to "dominate or interfere in the formation or administration of any labor organization." These cases do not implicate the situation in which the employer has hired a group of employees that presently belong to a union with which the employer is in some way connected. By assigning work in this manner, an employer does not insert its wishes into the employee's union selection process. The award of work to employees whose union is conflicted does not of itself offend these employees right to conflict free leadership. The employer's assignment of

work to the conflicted union may send a signal to employees that it is better for them to join a union which has such connections, but it does not interfere with their ability to choose a conflict-free union in the first place. Similarly, the fact that an employer may assign work to a group of non-union employees, *see Plumbers Local 195 (Texas Oil and Chemical Terminals)*, 231 NLRB 525, 527–28 (1977), may indicate to workers that they may have a better chance to get work if they do not join a union at all. Nevertheless, these kinds of signals at the work assignment stage do not amount to an illegal effort to interfere with the union formation process in the first instance.

Accordingly, we find Local 104's attempt to transfer the concerns of *Centerville Clinics* and *Medical Foundation of Bellaire* to the 10(k) context unpersuasive. We note, however, that while its actions may not be relevant in a 10(k) context, an employer may not interfere with its employees' right to choose a conflict-free union with impunity. Such employer interference is properly the subject of an unfair labor practice charge directly under § 8(a)(1) and (2) of the NLRA.

## CONCLUSION

As Local 104 offers no reason why the decision of the Board is arbitrary or capricious or unsupported by substantial evidence, we enforce the order of the NLRB.

Enforcement granted.

---

(2) to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it.

.     .        .      .      .

Section 157 states:

Employees shall have the right to self-organization, to form, join or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection ...