70 F.3d 1278
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
INTERNATIONAL LONGSHOREMEN'S & WAREHOUSEMEN'S UNION, LOCAL
10, Plaintiff-Counter-defendant-Appellee,
v.
LEVIN-RICHMOND TERMINAL CORPORATION,
Defendant-Counter-claimant-Appellant.
 No. 94-15061.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Aug. 16, 1995.
Decided Dec. 1, 1995.
 
 1
 Before: FLETCHER, POOLE, and O'SCANNLAIN, Circuit Judges
 
 
 2
 MEMORANDUM*
 
 
 3
 Levin-Richmond Terminal Corporation ("Levin") appeals the district court's grant of summary judgment for International Longshoremen's and Warehousemen's Union, Local 10 ("Local 10") on Levin's counterclaim against Local 10 under section 303 of the Labor Management Relations Act, 29 U.S.C. Sec. 187. We have jurisdiction, and we affirm.
 
 I.
 
 4
 Levin operates a marine shipping terminal in Richmond, California. Levin and Local 10 are parties to a collective bargaining agreement (the "CBA") under which Local 10 longshore workers handle lines on vessels calling at Levin's dock. After Local 10 picketed Levin in 1983 for work it claimed was within its jurisdiction, Levin signed a contract ("the 1983 Agreement") with Local 10, agreeing to employ Local 10 longshore workers to load and unload all break-bulk cargo[1] at the terminal. Despite the agreement, Local 10 workers never performed Levin's break-bulk work, and Levin eventually repudiated the 1983 Agreement as illegal. Although Local 10 longshore workers continued to perform lineswork for Levin, Levin's break-bulk work was performed by its own employees, represented by the International Union of Operating Engineers, Local Union No. 3 ("Local 3").
 
 
 5
 On November 30, 1992, Levin's employees started to load a shipment of wallboard that was being sent from the nearby Gold Bond factory to one of Gold Bond's customers. Although wallboard had never before been loaded at Levin's dock, longshore workers represented by Local 10 had traditionally done the work of loading wallboard aboard vessels in the San Francisco area. Local 10 began picketing at Levin's terminal to pressure Levin to assign the work of loading the ships to Local 10 workers rather than to Levin's Local 3 employees. Gold Bond's truck drivers refused to cross the picket line. Two days after the picketing began, Local 10 filed a lawsuit alleging that Levin was breaching the 1983 Agreement by failing to employ Local 10 longshore workers.
 
 
 6
 Gold Bond eventually arranged for the partially loaded ship to be unloaded and moved to a nearby terminal where Local 10 workers loaded the shipment of wallboard. A week after the ship left Levin's terminal, the district representative of Local 3 sent a letter to Levin stating that Local 3 disclaimed all interest in performing break-bulk work.
 
 
 7
 Levin filed this action as a counterclaim in Local 10's lawsuit. Levin sought damages under section 303 of the Labor Management Relations Act, 29 U.S.C. Sec. 187,[2] alleging that it was injured "by reason of" various violations of section 8(b)(4) of the National Labor Relations Act ("NLRA"). Local 10's action against Levin was dismissed by stipulation of the parties. The district court granted Local 10's motion for summary judgment on Levin's counterclaim, and Levin filed a timely notice of appeal. We review de novo. Jesinger v. Nevada Federal Credit Union, 24 F.3d 1127, 1130 (9th Cir.1994).
 
 II.
 
 8
 Levin argues that Local 10's picketing violated section 8(b)(4)(D) of the NLRA, 29 U.S.C. Sec. 158(b)(4)(D), which "makes it an unfair labor practice for a labor organization to ... coerce an employer ... in order to force or require the employer to assign particular work to one group of employees rather than to another." NLRB v. Plasterers Local Union No. 79, 404 U.S. 116, 123 (1971). We disagree.
 
 
 9
 To defeat Local 10's motion for summary judgment on the section 8(b)(4)(D) claim, Levin must produce evidence of a jurisdictional dispute, "defined as 'a dispute between two or more groups of employees over which is entitled to do certain work for an employer.' " Foley-Wismer & Becker v. NLRB, 695 F.2d 424, 427 (9th Cir.1982) (quoting NLRB v. Radio & Television Broadcast Eng'rs Union Local 1212, 364 U.S. 573, 579 (1961)); see also USCP-Wesco, Inc. v. NLRB, 827 F.2d 581 (9th Cir.1987). Nothing in the record demonstrates that Local 3 has ever disputed Local 10's claim to the break-bulk work. Local 3 neither requested nor made an affirmative claim to the break-bulk work, and Local 3 not only disclaimed the work by an official letter sent by Thomas Butterfield, the union's district representative, but also introduced evidence that Local 3 had a policy of disclaiming break-bulk work since at least 1985. Local 3's business representative, Thomas Westoby, submitted a declaration stating that when he assumed his position in 1983, he "learned that Local 3 had disclaimed any interest in loading or unloading 'break-bulk' cargo at Levin's dock.... Instead, Local 3 had recognized this type of work to be longshore work, within the jurisdiction of [Local 10]." According to Westoby, Levin's representatives repeatedly urged Local 3 to assert jurisdiction over the break-bulk work, but he "consistently told [Levin] that Local 3 had no interest in the work and respected [Local 10's] traditional jurisdiction to perform it instead."
 
 
 10
 In light of Levin's failure to introduce evidence controverting Local 3's disclaimer of any interest in Levin's break-bulk work, the district court did not err in granting Local 10's motion for summary judgment on Levin's section 8(b)(4)(D) claim.
 
 III.
 
 11
 We turn next to Levin's claim that Local 10's picketing was a secondary boycott violating section 8(b)(4)(B) of the NLRA, 29 U.S.C. Sec. 158(b)(4)(B). We have construed section 8(b)(4)(B) to "prohibit only pressure brought to bear on a third person who is wholly unconcerned in the disagreement, whether that pressure is called a secondary boycott or secondary activity." Chipman Freight Services, Inc. v. NLRB, 843 F.2d 1224, 1227 (9th Cir.) (internal quotations omitted), cert. denied, 488 U.S. 848 (1988); see also Local 761, Int'l Union of Elec., Radio & Mach. Workers v. NLRB, 366 U.S. 667, 672 (1961); NLRB v. General Truck Drivers of Contra Costa County, Local No. 315, 20 F.3d 1017, 1021 (9th Cir.1994); Iron Workers District Council of the Pacific Northwest, Local 29 v. NLRB, 913 F.2d 1470, 1475 (9th Cir.1990).
 
 
 12
 The hallmark of a secondary boycott is "pressure brought to bear, not upon the employer who alone is a party [to a dispute], but upon some third party who has no concern in it with the objective of forcing the third party to bring pressure on the employer to agree to the union's demands." NLRB v. Local 825, Int'l Union of Operating Eng'rs, 400 U.S. 297, 302 (1971) (internal citation and quotation omitted); see also National Woodwork Mfrs. Ass'n v. NLRB, 386 U.S. 612, 623-26 (1967). Local 10's picketing does not fit this paradigm. The only parties to the work assignment dispute were Levin and Local 10:[3] Local 10, operating under a collective bargaining agreement with Levin, wanted the break-bulk work assignment from Levin. Levin was the primary employer in the dispute, not a " 'wholly unconcerned' " third party. See Chipman, 843 F.2d at 1227 (quoting Production Workers Union v. NLRB, 793 F.2d 323, 328 (D.C.Cir.1986)).
 
 
 13
 Levin's reliance on International Longshoremen's Union, Local 62-B v. NLRB, 781 F.2d 919 (D.C.Cir.1986) ("Alaska Timber "), is misplaced. The D.C.Circuit found a secondary boycott in Alaska Timber because "[t]here was no contractual relationship whatsoever between [the picketed business] and the employees represented by the Union." Id. at 927. In this case, Levin and Local 10 are parties to a CBA. The fact that Local 10's purpose was to extend the scope of the CBA to include break-bulk work rather than to preserve its right to do work traditionally performed by it for Levin does not render its picketing secondary under section 8(b)(4)(B). Although the NLRA does protect an employer against some picketing aimed at enlarging a union's jurisdiction, that protection is found in section 8(b)(4)(D), not section 8(b)(4)(B). See Operating Eng'rs, 400 U.S. at 305 (although sections 8(b)(4)(D) and 8(b)(4)(B) both protect neutrals, "the basic purpose" of section 8(b)(4)(B) differs from that of section 8(b)(4)(D). Levin is not entitled to relief under subsection (B) of section 8(b)(4) simply because its claim under subsection (D) fails due to the absence of a jurisdictional dispute.
 
 IV.
 
 14
 Levin's final argument is that Local 10 violated section 8(b)(4)(A) of the NLRA, 29 U.S.C. Sec. 158(b)(4)(A), by picketing and filing a lawsuit to enforce the terms of the 1983 agreement, which it alleges is illegal under section 8(e), Id. Sec. 158(e). Levin's claim fails even if the 1983 agreement does violate section 8(e).
 
 
 15
 Levin has failed to introduce any evidence controverting the statements of Local 10's representatives, who stated in deposition testimony that Local 10's purpose in picketing was to obtain Levin's loading work for its longshore workers, not to enforce the 1983 agreement. Even if Levin could establish that Local 10 had some unlawful motives in addition to its principal purpose of obtaining the break-bulk work assignment, Levin's claim for damages would fail because Levin has not introduced any evidence suggesting that "the unlawful objective ... 'materially contributed' to [its] loss or [was] a 'substantial factor' in bringing it about." See Mead v. Retail Clerks Int'l Ass'n, Local Union No. 839, 523 F.2d 1371, 1379 (9th Cir.1975).
 
 
 16
 Levin also argues that Local 10 violated section 8(b)(4) by filing a lawsuit to enforce the 1983 agreement. However, nothing in the record supports Levin's allegation that it was injured as a result of Local 10's lawsuit. Indeed, Levin's counsel conceded in the district court that "any damages ... would have to relate to the picketing, not to the filing of the lawsuit."[4]
 
 CONCLUSION
 
 17
 Levin failed to create a genuine issue of material fact regarding whether it was injured "by reason of" a violation of section 8(b)(4) of the NLRA. See 29 U.S.C. Sec. 187. The district court's grant of Local 10's motion for summary judgment on Levin's counterclaim is affirmed.
 
 
 18
 AFFIRMED.
 
 O'SCANNLAIN, Circuit Judge, dissenting:
 
 19
 I respectfully dissent because I am persuaded that a genuine issue of material fact compels the need for trial in this case. Notwithstanding the reluctance of Local 3 to assert its real interest, there is significant evidence in the record of a jurisdictional dispute between the two unions. Levin produced evidence that Local 3 did not disclaim its interest in the work until after the work was lost, and Local 3 workers continued to handle break-bulk work after the disclaimer. These facts are sufficient to raise a genuine issue of material fact viewing the evidence in the light most favorable to the non-moving party. Fed.R.Civ.P. 56(c); Jesinger v. Nevada Fed. Credit Union, 24 F.3d 1127, 1130 (9th Cir.1994).
 
 
 20
 More compelling are the concerns Levin raised with regard to the secondary boycott issue. Citing NLRB v. Local 825, Int'l Union of Operating Eng'rs, 400 U.S. 297, 302 (1971), the majority states that "the hallmark of a secondary boycott is 'pressure brought to bear, not upon the employer who alone is a party [to a dispute], but upon some third party who has no concern in it with the objective of forcing the third party to bring pressure on the employer to agree to the union's demands.' " The majority then concludes that Local 10's picketing to secure the break-bulk work from Levin was neither illegal nor a secondary boycott because Levin was not a "wholly unconcerned" party, but rather the primary employer in a dispute, citing Chipman Freight Services, Inc. v. NLRB, 843 F.2d 1224, 1227 (9th Cir.) (quoting Production Workers Union v. NLRB, 793 F.2d 323, 328 (D.C.Cir.1986), cert. denied, 488 U.S. 848 (1988).
 
 
 21
 I am of the view that Alaska Timber controls and that Chipman and NLRB v. Local 825 are not applicable. Under the logic of International Longshoremen's Union, Local 62-B v. NLRB, 781 F.2d 919 (D.C.Cir.1986) ("Alaska Timber "), which is factually closer to this case, Local 10's activity constituted illegal secondary picketing. We have previously cited Alaska Timber, stating that "where the object [of a union] is to force the employer to use employees represented by a union with which the employer has not contracted and to cease doing business with another union, a charge can be filed under 8(b)(4)(B), which governs secondary picketing." USCP-Wesco, Inc. v. NLRB, 827 F.2d 581, 586 (9th Cir.1987). Here, the affidavits disclose that Local 10 conceded that its goal was to force Levin to use employees represented by Local 10 in lieu of the employees represented by Local 3, compelling the conclusion that Local 10 engaged in a prohibited activity.
 
 
 22
 The "work preservation" doctrine provides further support for the application of Alaska Timber 's logic. In NLRB v. International Longshoremen's Association, 447 U.S. 490 (1979), the Court explained that
 
 
 23
 a lawful work preservation agreement must pass two tests: First, it must have as its objective the preservation of work traditionally performed by employees represented by the union. Second, the contracting employer must have the power to give the employees the work in question.
 
 
 24
 Id. at 504. Although in the case at issue, Levin did possess the power to assign the work, Local 10 was without a tradition of performing the work for Levin. The union had no legal contract to do break-bulk work, had never done any stevedoring work for Levin, and had no collective bargaining agreement covering any kind of stevedoring work for Levin. Without a work preservation interest, Local 10 had no valid grounds to picket.
 
 
 25
 I would reverse the district court's grant of summary judgment and remand the case for trial on the merits.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 "Break bulk" cargo generally is in discrete units, such as wallboard stacked on pallets
 
 
 [2]
 Section 303 declares it illegal to "engage in any activity or conduct defined as an unfair labor practice in section 185(b)(4) of this title" and that "[w]hoever shall be injured ... by reason of any violation ... shall recover damages by him sustained and the cost of the suit." 29 U.S.C. Sec. 187
 
 
 [3]
 At the hearing on Local 10's motion for summary judgment, the parties agreed "that Levin was the one being picketed rather than Gold Bond or COTCO." In light of Levin's concession, we do not consider Levin's claim on appeal that Local 10 was picketing Gold Bond. See Telco Leasing, Inc. v. Transwestern Title Co., 630 F.2d 691, 693 (9th Cir.1980) (recognizing "general rule that an appellant's failure to interpose an objection at the trial court level will ordinarily foreclose him from raising that issue on appeal")
 
 
 [4]
 Levin's claim for attorneys' fees incurred during prior NLRB proceedings fails because those fees are not recoverable in an action for damages under section 303. Summit Valley Indus., Inc. v. Local 112, United Brotherhood of Carpenters, 456 U.S. 717, 727 (1981); Mead, 523 F.2d at 1380-81