LOCAL 32B–32J, SERVICE EMPLOYEES INTERNATIONAL UNION, AFL–CIO, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 94–1537.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 11, 1995.

Decided Oct. 17, 1995.

Ira A. Sturm, New York City, argued the cause and filed the briefs, for petitioner.

William A. Baudler, Attorney, National Labor Relations Board, argued the cause, for respondent, with whom Linda R. Sher, Acting Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, and Peter D. Winkler, Supervisory Attorney, National Labor Relations Board, were on the briefs.

Before: WALD, SILBERMAN, and ROGERS, Circuit Judges.

SILBERMAN, Circuit Judge:

Local 32B–32J, Service Employees International Union, AFL–CIO, petitions for review of a National Labor Relations Board decision holding that the Local's demand for arbitration against Nevins Realty Corp. was an unfair labor practice in violation of § 8(b)(4)(ii)(B) (secondary boycott) of the National Labor Relations Act, and imposing a broad cease and desist order and attorney's fees on the Local. We deny the petition as to the violation and the attorney's fee award, but grant the petition as to the scope of the cease and desist order.

## I.

The Local has represented a superintendent and (for some years) a porter employed by Nevins at a building in Brooklyn since 1965. The Local and Nevins have signed successive collective bargaining agreements—using the Local's form contract—for these two employees. The form contract lists categories of work under the Local's jurisdiction—including porters, matrons, and cleaning persons—but was modified in early versions by inserting riders to indicate that only the superintendent and porter were covered and by deleting references to other categories of service employees. The agreement for January 1, 1987, through January 31, 1990, did not delete these other work categories, although an unnumbered inserted sheet of paper stated that "This agreement covering the Superintendent shall expire December 31, 1989."

Nevins has always contracted out the cleaning work and the cleaning subcontractors have consistently employed Local members. In 1989, a dispute arose over whether the agreement covered the subcontractor's employees. Nevins had become dissatisfied with the services of the cleaning subcontractor, ISS Maintenance. The Local, hearing that Nevins wanted to replace ISS, told Nevins that under the agreement's subcontracting clause, Nevins must employ a union subcontractor that would maintain the wage and benefit structure.[1] Nevins subsequently re-

1. The text of the subcontracting clause is in relevant part as follows:

tained a new union subcontractor, Guardian Service Industries, Inc., but also filed a demand for arbitration over the interpretation of the contract, claiming the cleaning work was not "heretofore performed" by bargaining unit employees and was therefore not protected by the subcontracting clause. The Local sent Nevins a letter stating that Nevins did *not* have to employ a *union* subcontractor, but that any subcontractor chosen must comply with the terms of the subcontracting clause by hiring the former employees and providing the same wage and benefit structure. Before there was any resolution of the matter, Nevins withdrew its arbitration demand.

In 1990, Nevins refused to renew the contract because it did not delete references to other categories of employees; Nevins reasserted that the contract should cover only the superintendent and porter and not the employees of any cleaning subcontractor. No new agreement was signed, but the previous contract continued in force under an "Evergreen Clause." [2] Nevins again became dissatisfied with the cleaning subcontractor, and replaced Guardian with Golden Mark Maintenance, Ltd., who employed members of a rival union. The Local had an ongoing dispute with Golden over Golden's refusal to hire its members. The Local promptly wrote Nevins, reasserting its position that the new subcontractor must hire the old employees and provide the same wage and benefit structure, although the cleaning subcontractor was not obliged to sign an agreement with the Local. (The Local also told Golden that it represented the former cleaning employees and demanded that Golden hire them in compliance with the subcontracting clause.) When Nevins did not respond, the Local filed

a demand for arbitration, alleging that Nevins had breached the contract's subcontracting clause by failing to require Golden to hire the former employees and maintain the wage and benefit structure. Nevins then filed an unfair labor practice charge with the Board. The Regional Director issued a complaint and the Local immediately halted the arbitration proceedings pending the outcome of the unfair labor practice claim.

The ALJ determined that the Local had violated § 8(b)(4)(ii)(B) by making the demand for arbitration because the work in question had never been done by members of the bargaining unit and therefore was not fairly claimable. *Local 32B–32J, Service Employees Int'l Union and Nevins Realty Corp.*, reported at 313 N.L.R.B. 392 (1992). The object of the arbitration demand accordingly was not to preserve bargaining unit work with Nevins, but to further the Local's position in its primary labor dispute with Golden. The Local's resort to arbitration had an illegal objective because the contract interpretation the Local sought would *necessarily* violate § 8(e) as a "hot cargo" agreement. It was therefore inappropriate under *Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 740–44, 748–49, 103 S.Ct. 2161, 2168–69, 2172–73, 76 L.Ed.2d 277 (1983), to allow the arbitration to proceed. The ALJ issued a broad cease and desist Order based on "the policy of the Union to interpret and apply its industry-wide collective-bargaining agreement in a consistent and uniform manner," *Local 32B–32J*, 313 N.L.R.B. at 403, and required that the Local withdraw its demand for arbitration and reimburse Nevins for "all reasonable expenses and legal fees, with interest, incurred in defending against the arbitration demand," *id.*[3]

---

1. The Employer shall not make any agreement or arrangement for the performance of work and/or for the categories of work heretofore performed by employees covered by this Agreement except within the provisions and limitations set forth below.

    .     .     .     .     .

3. The Employer shall require the contractor to retain all bargaining unit employees working at the location at the time the contract was awarded and to maintain the existing wage and benefit structure....

4. This Article and Article VI are intended to be work preservation provisions for the employees employed in a particular building....

2. The clause provides that "[u]pon the expiration date of this Agreement as set forth in Article VIII, this Agreement shall thereafter continue in full force and effect for an extended period until a successor shall have been executed."

3. As an alternative basis for his holding, the ALJ determined that the "Evergreen Clause" was invalid and the contract had therefore expired. The ALJ's discussion of this clause was unneces-

The Local appealed, and the NLRB affirmed in a split decision. The Board noted that the arbitration "was not aimed at resolving a dispute involving Nevins' employees but rather was done to satisfy the [Local's] interests elsewhere.... [T]his secondary object is apparent on examination of the basis for [the Local's] grievance." *Local 32B–32J, Service Employees Int'l Union and Nevins Realty Corp.*, 313 N.L.R.B. 392, 392 (1993). The Local's work preservation defense lacked merit because the work in question "had always been performed by employees of various independent cleaning subcontractor companies" and not by the superintendent and porter. *Id.* The Board affirmed the remedial order without comment.

## II.

■ Section 8(b)(4)(ii)(B)—the "secondary boycott" provision—provides in pertinent part:

> (b) It shall be an unfair labor practice for a labor organization or its agents ... to threaten, *coerce,* or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—
>
> .     .     .     .     .
>
> (B) forcing or requiring any person ... to cease doing business with any other person....

29 U.S.C. § 158(b)(4)(ii)(B) (1988) (emphasis added). Consideration of an unfair labor practice claim under this section involves two related inquiries: Was the object of the union's conduct to force an employer to "cease doing business" with another person, and did the union's conduct threaten, coerce, or restrain the employer? *Carrier Air Conditioning Co. v. NLRB*, 547 F.2d 1178, 1188–90 (2d Cir.1976), *cert. denied,* 431 U.S. 974, 97 S.Ct. 2940, 53 L.Ed.2d 1072 (1977). The answer to these questions turns on whether the agreement or its maintenance is addressed to the contracting employer vis-a-vis his own employees, or rather is calculated to satisfy union objectives elsewhere. *National Woodwork Mfrs. Ass'n v. NLRB*, 386 U.S. 612, 623–27, 87 S.Ct. 1250, 1257–59, 18 L.Ed.2d 357 (1967); *NLRB v. International Union of Operating Engineers*, 400 U.S. 297, 302–05, 91 S.Ct. 402, 406–08, 27 L.Ed.2d 398 (1971).

The Local reiterates before us that its conduct had a valid object, *i.e.,* enforcement of a legitimate contract provision against its primary employer, Nevins. The subcontracting clause, it is argued, is a work preservation clause that protects bargaining unit work for the Local's members. Although prior agreements did not include the cleaning work, it was fairly claimable as bargaining unit work because the form contract signed in 1987 was not modified, and the contract remained in effect because of the "Evergreen Clause." The Local could legally seek to extend the contract to cover cleaning work because the superintendent and porter had, on occasion, done that work in emergency situations and because Nevins controlled who (which subcontractor) performed the work. *See NLRB v. International Longshoremen's Ass'n*, 447 U.S. 490, 504–05, 100 S.Ct. 2305, 2313–14, 65 L.Ed.2d 289 (1980) (*ILA I* ).

■ Petitioner's arguments are without merit. *Nevins'* employees had never meaningfully done the cleaning work. It is undisputed that Nevins has always used outside, independent contractors for that task. To be sure, the superintendent and porter have pitched in in emergency situations (*e.g.,* when someone used the stairs as a toilet), but that hardly makes the work fairly claimable. Even the owner might have to wield a mop in such circumstances. The Local's theory goes well beyond prior cases that suggest work may be fairly claimable when employees do the work on a regular basis, if only a small percentage of the time, *e.g., Truck Drivers, Union Local 705 v. NLRB*, 820 F.2d 448, 452–53 (D.C.Cir.1987) (*Emery Air Freight*).[4]

sary to the decision, and the NLRB has not contested the issue before this court. The Local vigorously argues that the ALJ improperly ignored the plain meaning of the clause and that numerous other court decisions and arbitrations have found similar or identical clauses valid. On the basis of these cases, and because the ALJ did not need to reach this issue, we do not endorse this part of his well-reasoned opinion.

**4.** *Local 32B–32J, Service Employees Int'l Union and Vaux Condominium,* 313 N.L.R.B. 267 (1993), is not to the contrary. The work that the

That the cleaning work classification was included in the terms of the form contract is irrelevant unless the employees actually perform the tasks. *See Building Material & Constr. Teamsters Local 216 and Bigge Drayage Co.,* 198 N.L.R.B. 1046, 1046–47 (1972), *enf'd,* 520 F.2d 172 (D.C.Cir.1975). And the facial validity of the subcontracting clause does not excuse the Local's conduct where its application, as in this instance, would illegally extend the contract to reach outside the contractual bargaining unit. *NLRB v. Enterprise Ass'n of Steam Pipefitters,* 429 U.S. 507, 517–18, 97 S.Ct. 891, 898–99, 51 L.Ed.2d 1 (1977) (*Pipefitters*); *Carrier,* 547 F.2d at 1185.

Since the Local fails to meet the threshold condition of showing that the work is fairly claimable, Nevins' "right to control" the work is irrelevant.[5] *See ILA I,* 447 U.S. at 511–12, 100 S.Ct. at 2317–18. In sum, the Local's efforts to enforce its interpretation of the contract were intended not to preserve work (that it had never done), but to pressure Golden to change its labor policies. This is a classic secondary boycott; the Local put pressure on Nevins, potentially causing substantial disruption to Nevins' business relations with Golden, to further its dispute with Golden.

■ The Local alternatively argues that even if it cannot legitimately claim that the bargaining unit included cleaning employees, its demand for arbitration by itself is not "coercive." The Supreme Court has determined that litigation can constitute an unfair labor practice if, *inter alia,* it has an illegal objective under federal law. *Bill Johnson's,* 461 U.S. at 747, 103 S.Ct. at 2172. There is no logical reason to exclude arbitration from this principle. *See, e.g., Emery Air Freight,* 820 F.2d 448 (assuming applicability of *Bill Johnson's* to arbitration); *Local Union No. 25, Int'l Bhd. of Teamsters v. NLRB,* 831 F.2d 1149, 1154 (1st Cir.1987). As the ALJ noted, "it would be sheer folly to permit an unreasonable arbitration for an illegal object to proceed to enforcement at which time only ashes remain to be salvaged." *Local 32B–32J,* 313 N.L.R.B. at 402.

■ We noted in *Emery Air Freight,* 820 F.2d at 452, that to find arbitration has an illegal objective, the Board must determine that the collective bargaining interpretation sought must itself be illegal. Here, the Local's interpretation effectively would prevent Nevins from doing business with Golden. That means, of course, that the agreement would violate § 8(e) (the hot cargo clause) even if Nevins voluntarily entered into it.[6] In *Emery* we remanded to the Board because it had omitted that last analytic step. The Board had never determined that the union's requested interpretation would necessarily result in an illegal hot cargo agreement, and there seemed to be plausible arguments that it would not. Here, however, the Board has clearly determined—and correctly in our view—that the Local's interpretation

---

union sought to claim overlapped in practice with bargaining unit work, and the relations of the parties had a complicated history. *Id.* at 271–72. The particular circumstances of *Vaux,* not present with Nevins, make the case inapposite.

5. The "right to control" doctrine developed in cases where it was undisputed that the work in question had been traditionally performed by bargaining unit employees. For example, two unions whose members had traditionally performed a certain type of work might both claim a new, similar type of work. If one union pressures an employer who has no power over the new work, then that union's conduct presumptively is directed toward another (secondary) employer who does have that power. The test thus resolves—*after* the work has been found fairly claimable—whether the union exerted pressure on the proper (primary) employer. *See ILA I,* 447 U.S. at 504–05, 100 S.Ct. at 2313–14; *Pipe-*

*fitters,* 429 U.S. at 521–28, 97 S.Ct. at 899–900; *International Longshoremen's & Warehousemen's Union, Local 62–B v. NLRB,* 781 F.2d 919, 926–27 (D.C.Cir.1986).

6. 29 U.S.C. § 158(e) (1988) reads in pertinent part as follows:

(e) It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees ... to cease doing business with any other person ...

Section 8(e) does not add to the prohibitions of § 8(b)(4)(ii)(B), but merely prevents employers from *voluntarily* entering into such agreements, designated as "hot cargo" agreements. *Woodwork Mfrs. Ass'n,* 386 U.S. at 634–35, 87 S.Ct. at 1262–63.

of the contract would constitute a hot cargo agreement.

The Local's argument that the merits of its claim had not been previously determined, and that once the unfair labor practice complaint issued, the Local immediately stayed the proceedings, is thus beside the point. To be sure, prior cases finding resort to arbitration unlawful have involved situations in which the party pursued arbitration *after* the Board had resolved a disputed issue against the party. *E.g., International Longshoremen's and Warehousemen's Union v. NLRB,* 884 F.2d 1407, 1413–14 (D.C.Cir.1989) (*ILWU*); *Chauffeurs, Teamsters and Helpers Local 776 v. NLRB,* 973 F.2d 230, 234–35 (3d Cir.1992) (*Rite Aid*), *cert. denied,* —— U.S. ——, 113 S.Ct. 1383, 122 L.Ed.2d 758 (1993). Those cases are distinguishable because they did not involve suits that were unlawful from the start. *Longshoremen's Local 7 and Georgia–Pacific,* 291 N.L.R.B. 89 (1988), *aff'd sub nom. Georgia–Pacific Corp. v. NLRB,* 892 F.2d 130 (D.C.Cir.1989), and *ILWU,* 884 F.2d 1407, on which the Local relies, are inapposite, because they dealt with § 8(b)(4)(ii)(D), which has a particular statutory procedure for determining representation issues such that a grievance procedure cannot be considered unlawful prior to a Board determination.

### III.

▮ The Local also challenges the ALJ's remedial order, affirmed summarily by the Board. The ALJ required the Local to withdraw its demand for arbitration, to reimburse Nevins for attorney's fees, and to cease seeking to enforce or apply any collective bargaining agreement in a manner that violates the Act. We are obliged to defer heavily to Board remedial decisions. *See, e.g., NLRB v. Gissel Packing Co.,* 395 U.S. 575, 610–615, 89 S.Ct. 1918, 1938–1940, 23 L.Ed.2d 547 (1969) (noting that the Board can properly consider the extent of violations and the likelihood of future recurrences); *Fibreboard Paper Products Corp. v. NLRB,* 379 U.S. 203, 214–17, 85 S.Ct. 398, 404–06, 13 L.Ed.2d 233 (1964); *Teamsters Local 115 v. NLRB,* 640 F.2d 392, 399 (D.C.Cir.1981), *cert. denied,* 454 U.S. 827, 102 S.Ct. 119, 70

L.Ed.2d 102 (1981); *cf. National Treasury Employees Union v. Federal Labor Relations Authority,* 910 F.2d 964, 966–68 (D.C.Cir.1990) (en banc) (emphasizing the extreme deference due agency remedial decisions). Even remedial decisions must, however, follow announced policies and procedures. *United Food & Commercial Workers Int'l Union v. NLRB,* 852 F.2d 1344, 1347 (D.C.Cir.1988).

▮ The Local correctly points out that, in accordance with the American Rule, attorney's fees generally are not awarded in Board proceedings. *Summit Valley Indus. Inc. v. United Bhd. of Carpenters & Joiners of America,* 456 U.S. 717, 721–23, 102 S.Ct. 2112, 2114–15, 72 L.Ed.2d 511 (1982) (holding that Labor Management Relations Act § 303, which authorizes recovery of "damages" for employers injured by an unfair labor practice, does not provide authorization for awarding attorney's fees for Board proceedings). It contends that attorney's fees would be appropriate only if the Local persisted *after* the Board issued a complaint; here, the Local suspended arbitration when the complaint issued, and there had been no prior determination on the merits of the issue. The Local misconceives the reason for the award of attorney's fees. It is not because the Local's behavior is particularly egregious but rather because the litigation itself is the illegal act. Since, as the Board determined, the Local's attempt to arbitrate was illegal *ab initio,* it matters not that the Local suspended its efforts once a complaint issued. *Cf. Rite–Aid,* 973 F.2d at 234 (affirming the Board's imposition of attorney's fees from the time at which the arbitration became unlawful). Nevins' costs, even before the complaint issued, are therefore the logical measure of damages. The Board's reasoning was presaged by the Supreme Court in *Bill Johnson's.* The Court suggested that attorney's fees would be appropriately awarded if the litigation was unlawful. 461 U.S. at 747, 103 S.Ct. at 2172. We therefore conclude the award of attorney's fees was not an abuse of the Board's discretion.

▮ More troublesome, however, is the Local's protest as to the breadth of the Or-

der. The Order requires the Local to cease and desist from:

seeking to enforce or apply, through arbitration, any collective-bargaining agreement with Nevins Realty Corp., or any other person having an agreement with it who is engaged in commerce or in an industry affecting commerce, where an object thereof is to force or require Nevins, or any such other person, to cease doing business with Golden Mark Maintenance, Ltd., the State of New York, the City of New York or any other person.

*Local 32B–32J,* 313 N.L.R.B. at 404. The ALJ based this broad order, which essentially restates § 8(b)(4)(ii)(B), on the Local's "policy" of interpreting its form contract uniformly and consistently throughout the industry. But, the Local correctly maintains that no such "policy" was shown. No evidence was introduced to show the Local's behavior with respect to any other employer. The ALJ inferred the Local's policy merely because a form contract was employed. That assumption is unwarranted in the absence of any showing that any other employer was similarly situated—and that the Local adopted a similar stance. We may not approve an order as broad as the ALJ's without such a showing. *See Sure–Tan Inc. v. NLRB,* 467 U.S. 883, 900, 104 S.Ct. 2803, 2813, 81 L.Ed.2d 732 (1984); *Torrington Extend–A–Care Employee Ass'n v. NLRB,* 17 F.3d 580, 585 (2d Cir.1994); *United Steelworkers of America v. NLRB,* 646 F.2d 616, 640–42 (D.C.Cir.1981).

Accordingly, we deny the petition in part and grant the Board's cross-application for enforcement in part.